**UNITED STATES of America,**
**Plaintiff,**

v.

**CONTINENTAL CAN COMPANY, Inc.**
**and Hazel-Atlas Glass Company,**
**Defendants.**

United States District Court
S. D. New York.
April 15, 1963.

See also 22 F.R.D. 235; 22 F.R.D. 241.

Lee Loevinger, Asst. Atty. Gen., W.
Wallace Kirkpatrick, Acting Asst. Atty.
Gen., Larry L. Williams, Chief, Special
Trial Section, Dept. of Justice, George D.
Reycraft, Jr., Chief, Special Trial Section, Dept. of Justice, William H. Mc
Manus and Samuel V. Greenberg, Trial
Counsel, Attys., Dept. of Justice, for the
United States.

Willkie, Farr, Gallagher, Walton &
Fitz Gibbon, New York City, for defendants; Mark F. Hughes, Helmer R. Johnson and Milton Handler, Trial Counsel,
New York City, Bowie K. Kuhn and
Stanley D. Robinson, New York City, of
counsel.

FREDERICK van PELT BRYAN,
District Judge.

This is a civil action by the United
States to enjoin the proposed acquisition
by defendant Continental Can Company,
Inc. (Continental) of defendant Hazel-
Atlas Glass Company (Hazel-Atlas) on
the ground that such acquisition would
violate § 7 of the Clayton Act as amended.[1] The court has jurisdiction over parties and subject matter.

The Government had previously attempted to block the acquisition by invoking a consent decree which had been
entered against Continental in 1950 in a
civil anti-trust suit under §§ 1 and 2 of
the Sherman Act and § 3 of the Clayton
Act in the District Court for the Northern District of California. On August
31, 1956 the California court held that
the consent decree did not cover the proposed acquisition.[2]

The consummation of the acquisition
was delayed in the meantime at the
Government's request. The Government
then commenced this action. It moved
for a preliminary injunction against consummation and sought a temporary restraining order pending the hearing and
determination of its motion. The temporary restraining order was denied on
September 13, 1956. On that day, Continental took over all of the assets, property, business and good will and assumed
all of the liabilities of Hazel-Atlas which
since then has been operated as the Hazel-
Atlas Division of Continental.

The Government withdrew its motion
for a preliminary injunction on September 18, 1956 and this action became one
for divestiture.

After some considerable time, the case
was assigned to me for all purposes.
Extensive pre-trial proceedings were conducted at which over a thousand pages
of transcript were taken. The case then
came on for trial.

The Government concluded its case after six weeks of trial during which it
called some 78 witnesses. Over four
thousand pages of testimony were taken.
The Government introduced more than
twelve hundred exhibits and the defendants more than five hundred.

At the conclusion of the Government's
case defendants, pursuant to Rule 41(b),
F.R.Civ.P., moved for a dismissal on the
ground that upon the law and the facts
the Government had shown no right to
relief and that they were therefore en-

1. 15 U.S.C. § 18: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part
of the stock or other share capital and
no corporation subject to the jurisdiction of the Federal Trade Commission
shall acquire the whole or any part of
the assets of another corporation engaged also in commerce, where in any
line of commerce in any section of the
country, the effect of such acquisition
may be substantially to lessen competition, or to tend to create a monopoly.
* * * "

2. United States v. Continental Can Company, 143 F.Supp. 787 (N.D.Cal.1956).

titled to final judgment on the merits. The motion was granted in a brief oral decision which stated only the conclusions reached. In view of the importance and complexity of the case a detailed opinion was to follow.

Before that opinion could be filed, the Supreme Court decided Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), its first decision dealing at any length with § 7 of the Clayton Act as amended in 1950. The Government then asked leave to submit material dealing with the effect of that case on the case at bar. This application was granted and both sides submitted briefs on this question. Consideration of the Brown Shoe case has not changed the conclusions which I reached at the end of the trial.

My opinion follows.

Defendants' motion under Rule 41(b) for a dismissal at the close of the Government's case, posed squarely the question of whether on the record, as it then stood, defendants were entitled to judgment.

■ The motion was made on the ground that "upon the facts and the law the plaintiff has shown no right to relief." In an action tried to the court without a jury, the court, when such a motion is made at the close of plaintiff's case, "as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence."

■ There is no doubt as to the meaning and applicability of Rule 41(b). The test to be applied in a case tried to the court alone is quite different from that on a motion to dismiss or for a directed verdict in a jury trial. In the latter case the question is whether or not the plaintiff has made out a prima facie case

sufficient to go to the jury and the court must view the evidence in the light most favorable to him.

■ In a trial to the court alone, however, the court is authorized under Rule 41(b), to evaluate and weigh all of the evidence presented by the plaintiff, draw such inferences therefrom as it considers reasonable in the light of the record, and determine at that stage whether plaintiff has sustained the burden of proof necessary to establish its right to relief were the case to end there. If the court undertakes to make such a determination and concludes that the plaintiff has not met this burden, the defendant is entitled to judgment on the merits.[3]

In this case, as the trier of the facts, I determined at the conclusion of the Government's case that it had failed to sustain its burden of showing by a preponderance of the evidence that the acquisition under attack violated Section 7 of the Clayton Act in any respect. I therefore directed that judgment be rendered against the Government.

## I.

### Section 7 of the Clayton Act in the Light of the Brown Shoe Case.

The Government's case is grounded solely on Section 7 of the Clayton Act as amended in 1950. There is no claim of violation or threatened violation of any provision of the Sherman Act. There is no charge of restraint of trade, monopolization or attempt to monopolize. This is strictly a Section 7 case.

Section 7 as amended forbids the acquisition of the stock or assets of one corporation by another "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."[4]

3. Global Commerce Corporation v. Clark-Babbitt Industries, Inc., 255 F.2d 105 (2 Cir.1958); Huber v. American President Lines, 240 F.2d 778 (2 Cir.1957); Henry v. Moore-McCormack Lines, Inc., 134 F.Supp. 71 (S.D.N.Y.1955); Brahms

v. Moore-McCormack Lines, Inc., 133 F. Supp. 283 (S.D.N.Y.1955); 5 Moore's Federal Practice p. 1044, et seq. (2d ed. 1951). See also Blood v. City of New York, 237 F.2d 855 (2 Cir.1956).

4. 15 U.S.C. § 18.

The Brown Shoe case, decided on June 25, 1962, some twelve years after the 1950 amendment to § 7, is the first definitive interpretation of that section by the Supreme Court since its amendment.

■ The facts in the Brown Shoe case were entirely different from those in the case at bar. The specific holdings of the Court on the facts presented there are therefore not determinative of the problems posed here. Indeed, Brown Shoe recognizes that the facts in each case in all likelihood will differ widely, that the framework of each industry is likely to be unique, and that each case must stand or fall on its own facts viewed within the framework of the industry pattern.[5]

■ However, the discussion in Brown Shoe of the legislative history and background of the 1950 amendment to § 7, the theory of the amended section, the interpretation to be given to it, and the principles and guidelines to be followed in applying it, is controlling.[6] Brown Shoe is the authoritative declaration of the law on the subject as it now stands and the principles and guidelines which it lays down must be applied here.

■ Section 7 proscribes acquisition of either stock or assets where, as a result, competition in any line of commerce in any section of the country may be substantially lessened. It covers all mergers or acquisitions, horizontal, vertical or conglomerate.[7]

■ As Brown Shoe makes plain, however, the section does not prohibit all mergers. While the congressional intent was to arrest restraints of trade and monopolistic tendencies "in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding,"[3] there is no per se proscription against the acquisition of the stock or assets of one corporation by another. The statute is concerned only with those acquisitions which have demonstrable anti-competitive effects.[9]

■ It is clear, moreover, that the statute was directed neither at the possibility that anti-competitive effects might occur nor at certainty of anti-competitive effects already covered by the Sherman Act.[10] "[P]roof of a mere *possibility* of a prohibited restraint or tendency to monopoly will not establish the statutory requirement * * *."[11] The statute is concerned with the reasonable probability of the lessening of competition or tendency toward monopoly as a result of the particular acquisition under scrutiny—a showing that such effects are reasonably likely to occur. This is what the words "may be" as used in the statute mean.[12] The lessening of competition, moreover, must also be shown to be "substantial".[13]

■ Acquisitions are proscribed where substantial anti-competitive effects or tendency to monopoly are reasonably probable in *any* line of commerce in *any* section of the country. Thus, in order to determine whether there are anti-competitive effects or tendency to monopoly, it is necessary in each case to define the lines of commerce in which the acquiring and acquired companies were engaged and the sections of the country af-

5. Brown Shoe Co. v. United States, supra, 370 U.S. pp. 321–322, 82 S.Ct. pp. 1521–1522.

6. The legislative history of Section 7 and the 1950 amendment is reviewed exhaustively in Brown Shoe (370 U.S. pp. 311–323, 82 S.Ct. 1516–1522). Further general discussion here is unnecessary.

7. Brown Shoe Co. v. United States, supra, p. 317, 82 S.Ct. p. 1519.

8. S.Rep. No. 1775, 81st Cong., 2d Sess. pp. 4–5 (1950) U. S. Code Congressional Service 1950, p. 4293.

9. Brown Shoe Co. v. United States, supra, pp. 319–320, 82 S.Ct. p 1521.

10. Brown Shoe Co. v. United States, supra, p. 323, 82 S.Ct. p. 1522.

11. United States v. E. I. DuPont de Nemours & Co. (General Motors), 353 U.S. 586, 598, 77 S.Ct. 872, 880, 1 L. Ed.2d 1057 (1957).

12. A. G. Spalding & Bros., Inc. v. Federal Trade Commission, 301 F.2d 585 (3 Cir. 1962).

13. S.Rep. No. 1775, 81st Cong. 2d Sess., p. 3 (1950).

fected. Anti-competitive effects and their substantiality cannot be evaluated in a vacuum. They can only be judged in terms of the particular markets or submarkets affected—that is to say "within the area of effective competition."[14]

While Section 7 does not use the term "market", it is clear that "line of commerce" refers to a product market, and "section of the country" refers to a geographic market in which competition exists and in which the effects of the acquisition may be felt. A relevant product market must be a market which is meaningful in terms of competitive and commercial realities.[15] A relevant geographic market must embrace an economically significant section of the country in terms of competitive effects.[16]

Thus, relevant markets are neither economic abstractions nor artificial conceptions. They are rather specific areas where, viewed in the context of the facts of the particular case under consideration, there may be demonstrable anti-competitive effects as the result of the acquisition. The test then is whether the acquisition has demonstrable anti-competitive effects in any relevant product market in any section of the country.

Section 7 does not spell out any particular tests or standards for determining the relevant product markets or geographic areas which may be affected by the acquisition. Nor does it supply, either in quantitative or qualitative terms, any tests for determining whether the effects may be "substantially" to lessen competition. "However, sufficient expressions of a consistent point of view may be found in the hearings, committee reports of both the House and Senate and in floor debate to provide those charged with enforcing the Act with a usable frame of reference within which to evaluate any given merger."[17]

Against this background the tests and standards to be used vary depending upon what may be appropriate in the light of a wide variety of factors. These factors include the nature, business and relationships of the acquired and acquiring companies, the markets which they serve, the kind and extent of competition in such markets, the pattern of the industry as a whole and the place of such companies in the industry.

Thus, in determining relevant product markets it has been deemed pertinent to examine such factors as the peculiar uses and characteristics of the product; its distinguishing physical characteristics; whether it is sold to distinct classes of customers; distinct price differentiations; sensitivity to price changes; reasonable interchangeability of use and demand; public or industry recognition of the market as a separate market entity; unique production facilities; and specialized vendors.[18]

In determining the geographic market pertinent factors include scale of distribution; locale of actual and potential buyers and of competing sellers; focus of competition; and whether regional markets interlock to form a larger market.[19]

None of these factors are conclusive in themselves and all must be "functionally viewed, in the context of [the]

14. United States v. E. I. DuPont de Nemours & Co. (General Motors), supra, 353 U.S. 593, 77 S.Ct. 877.

15. Crown Zellerbach Corporation v. Federal Trade Commission, 296 F.2d 800, 811, (9 Cir.1961), cert. den. 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962).

16. Brown Shoe Co. v. United States, supra, 370 U.S. p. 320, 82 S.Ct. 1521.

17. Brown Shoe Co. v. United States, supra, p. 315, 82 S.Ct. 1518.

18. Brown Shoe Co. v. United States, supra; United States v. E. I. DuPont de Nemours & Co. (General Motors), supra; Crown Zellerbach Corporation v. Federal Trade Commission, supra; United States v. Bethlehem Steel Corporation, 168 F.Supp. 576 (S.D.N.Y. 1958).

19. Brown Shoe Co. v. United States, supra; A. G. Spalding & Bros., Inc. v. Federal Trade Commission, supra; United States v. Bethlehem Steel Corp., supra.

particular industry." [20] Mere mechanical or quantitative application of § 7 should be avoided and each case must be judged in the light of its own peculiar facts. Only within such a setting can the probable anti-competitive effects of a merger be judged.[21]

In the light of these considerations the issues on which the Government had the burden of proof here were two-fold. First, it was required to delineate the relevant product markets or sub-markets in which it claimed that competition was adversely affected by the acquisition and the sections of the country affected. Second, it had to establish that in one or more of such markets or sub-markets in any particular section or sections of the country, there was reasonable probability that the effect of the acquisition would be substantially to lessen competition or to tend to create a monopoly.

## II.

### THE MERGING COMPANIES.

#### (1) Continental.

Continental Can Company, Inc. is a New York corporation with its principal offices in New York City. It was organized in 1913 by the merger of three companies engaged in the manufacture of metal cans.[22] At that time American Can Company was the dominant factor in the can industry.

After its organization Continental went through a period of substantial internal expansion. Beginning in 1923 and for the next twenty years it continued to expand internally and also by acquiring some twenty-four companies in various sections of the country which were also engaged in manufacturing various types of cans, some of which had not been previously manufactured by Continental. It also acquired several companies which did not produce metal cans but made other packaging products. Continental acquired its last can manufacturer in 1944.

Since that time it has engaged in a program of diversification aimed at increasing the variety of products which it is able to supply.

Its acquisitions have included companies producing can manufacturing and can closing machinery, flexible packaging, plastic containers and other plastic products, paper containers and paperboard, fibre drums, crown caps and vacuum closures, and a miscellany of other products.

In 1956 it acquired Hazel-Atlas, Robert Gair Company, Inc., a manufacturer of paperboard and similar products, and White Cap Company, which manufactured vacuum type metal closures.

By that time it was and had been for a good many years the second largest metal can manufacturer in the country. It was a formidable competitor of American Can Company which had long been the leader in the industry.

When it acquired Hazel-Atlas Continental's principal business was the manufacture and sale of metal cans and other metal containers to industrial consumers for a wide variety of uses. In 1955 metal cans and other metal containers accounted for between two-thirds and three-quarters of its total dollar sales volume. It also manufactured numerous other products, including fibre drums, flexible packaging materials, plastic products (including plastic containers), paper cups and plates, crown caps, vacuum type metal caps, can closing machinery, and special defense items.

By 1955 Continental had 72 plants for the manufacture of its products at various locations throughout the United States. It also had plants in seven for-

---

20. Brown Shoe Co. v. United States, supra, 370 U.S. pp. 321–322, 82 S.Ct. pp. 1521–1522.

21. Brown Shoe Co. v. United States, supra, p. 340, 82 S.Ct. p. 1532.

22. The three original companies were Continental Can Company, a New Jersey corporation; the Export and Domestic Can Company, a New York corporation; and the Standard Tin Plate Company, a Pennsylvania corporation.

eign countries, including Canada. Forty manufactured metal cans. Approximately 45,000 persons were in its employ.

Its net sales and operating revenues and net income for the years 1953, 1954 and 1955, in thousands of dollars, were:

| | Net Sales and Operating Revenues | Net Income |
|---|---|---|
| 1953 | $554,436 | $15,680 |
| 1954 | 616,163 | 20,736 |
| 1955 | 666,266 | 24,172 |

Its total assets as of December 31, 1955 were $381,917,000.

Including the Hazel-Atlas, Gair and White Cap acquisitions, for the year 1956 Continental had net sales and operating revenues of $1,010,268,000, and net income of $43,143,000 with total assets as of December 31, 1956 of $633,706,000.

Comparative 1955 combined figures for these four companies prior to acquisition, show net sales and operating revenues of $929,428,000, net income of $38,693,000, and total assets as of December 31, 1955 of $568,850,000.

### (2) Hazel-Atlas.

Hazel-Atlas was a West Virginia corporation with its principal office in Wheeling, West Virginia. It was organized prior to 1900 and, as a result of its acquisition by Continental, was dissolved on September 21, 1956.

Its principal business was the manufacture and sale of glass containers of various types to industrial consumers and of glass jars for home canning, both largely of the wide mouthed variety. It also manufactured glass tumblers, tableware, kitchenware, glass articles of special design for industrial use, screw type metal closures and closures for home canning glass jars. It appears to have been the third largest glass container manufacturer in the United States.

Hazel-Atlas operated plants at thirteen locations in various parts of the country, principally in the western Pennsylvania, West Virginia and eastern Ohio area, and had six warehouses. Its net sales and net income in 1953, 1954 and 1955, in thousands of dollars were:

| | Net Sales | Net Income |
|---|---|---|
| 1953 | $79,250 | $3,112 |
| 1954 | 79,174 | 3,629 |
| 1955 | 79,920 | 3,393 |

Its total assets as of December 31, 1955 were $37,884,000.

After acquisition by Continental the operations conducted by Hazel-Atlas were continued by the Hazel-Atlas Division of Continental and its operating figures were included in Continental financial statements. It does not appear that there was any substantial change in the volume or character of business done by the Hazel-Atlas Division in the period between its acquisition and the trial.

Prior to its acquisition Hazel-Atlas did not manufacture or sell metal cans, plastic or paper containers, vacuum type metal closures, crown caps or any other product manufactured or sold by Continental or its subsidiaries.

On the other hand, Continental did not, directly or through subsidiaries, manufacture or sell glass containers or any other glass products, screw type metal closures, or any product manufactured or sold by Hazel-Atlas. It is uncontroverted that the two merging companies manufactured and sold no identical products.

### III.

### THE TYPES OF PRODUCTS AND THE SEPARATE INDUSTRIES INVOLVED.

This case is concerned with three basic types of containers—those made of metal, glass and plastic. They are of a variety of shapes, sizes and end uses.

The three types of containers are produced by three recognized separate industries, each with its own structure and pattern, the metal can industry and the plastic container industry in which Continental was engaged, and the glass con-

tainer industry in which Hazel-Atlas was engaged.[23]

In addition to the three types of containers the case also is concerned with three different kinds of metal closures used to close or seal products packed in containers. They are crown caps, vacuum type closures and screw and lug type closures. Continental produced crown caps and vacuum type closures and Hazel-Atlas produced screw and lug type closures. Closures will be discussed separately though there is no separate metal closure industry.[24]

### (1) *Basic types of products.*

**(a)** *Metal cans.*

For Census Bureau statistical purposes the metal can is defined "as a single-walled container constructed wholly of tin plate, terne plate, blackplate or waste plate designed for packing products."[25] Such cans have distinct physical characteristics. They are rigid and unbreakable, but can be dented. Unlike plastic containers, they can be hermetically sealed and are impermeable to gases. They can be heat processed faster and are lighter than glass containers, and are not chemically inert.

The basic raw material used in can manufacture is tin-coated steel (tin plate), but some cans are made from uncoated steel (blackplate) or aluminum. Other raw materials include soldering compounds, paints, varnishes, lithographing inks, paper and cartons for packaging. The major factor in determining can prices is the cost of tin plate. Cans are generally sold f. o. b. the manufacturer's plant.

The products packed in metal cans are extremely numerous and varied and in fact cover a substantial segment of American industrial and agricultural production. However, for statistical purposes the Census Bureau has set up thirteen different general categories of metal cans all in terms of end use. The Bureau collects statistics from metal can manufacturers as to the amount of metal each consumes in the manufacture of cans in each of these categories.[26]

The thirteen Census Bureau end use categories are fruit and vegetables (including juice); evaporated and condensed milk; other dairy products; meat (including poultry); fish and seafood; coffee; lard and shortening; soft drink; beer; pet food; oil open-top (1 quart and 5 quart); all other food (including soup and baby food cans); and all other nonfood.[27] A number of these categories plainly include a great number and varie-

---

23. It may be noted that reference will be made to what is claimed to be an all encompassing "packaging industry". However, as will be pointed out, the evidence wholly failed to establish that there is any such relevant product market in this case. Nor was it established that there is any recognized separate industry or relevant product market comprising all metal, glass and plastic containers, or any general combinations of them.

24. See discussion infra p. 777.

25. G–1203. This definition excludes steel pails which are defined as "single-walled shipping containers having capacities of 1–12 gallons inclusive that are cylindrically constructed of steel sheet of 29 gauge and heavier."

26. Under the regulations of the Bureau metal can manufacturers report the number of base boxes of steel consumed in the manufacture of cans in each cate-

gory. A base box is a unit of area measurement. The Bureau does not prescribe which specific end products fit into each category and this is left to the discretion of the individual reporting manufacturer.

The base box figures so reported are then converted by the Bureau into short tons of steel on the basis of conversion factors for each category. The comparative production figures in this record are those based on short tons of steel used in the production of metal cans reported by manufacturers as belonging in the various census categories of metal cans shipped.

There are no published figures of the actual number of cans shipped and there are wide differences in the product mixes in terms of sizes of cans produced by the various manufacturers.

27. G–1203.

ty of specific end uses for which no accurate further breakdowns are available.

Among the principal types of cans are "Packers" cans and "General Line" cans. "Packers" cans are normally used for food products though they are used for many non-food products as well. They are round open-top or sanitary cans. The packer after filling the can puts the top on.

"General Line" cans are used both for food and non-food products and have different kinds of fittings and different shapes. There are other types of cans also. All types of cans are manufactured from the same raw materials by the same production processes and with the same equipment.

Cans used for one type of product may be used for other types of products also, but they usually have different linings for different products. For example, substantially the same open-top can is used for food, pet food, motor oil and other non-food products.

(b) *Glass containers.*

There are two basic types of glass containers, the wide mouth and the narrow neck container.

Glass containers have distinct physical characteristics. They are rigid, chemically inert and impermeable to gases; can be hermetically sealed but are readily broken; and, unlike many cans, can be easily resealed after they have been opened. Glass containers are heavier than other types of containers and must be carefully packed for shipment to avoid breakage. Costs of shipment are therefore higher. They take longer to heat process than cans. Many narrow

necked glass containers are suitable for re-use by bottlers and are returned by consumers to the bottler for such re-use.

Glass containers used for one type of product are often identical with containers used for widely dissimilar products. Thus, the same wide mouthed glass jar is used for peanut butter and silver polish, and the same narrow necked glass bottle is used for vinegar and liquid starch.

The basic raw materials used in the manufacture of glass containers are sand, lime and soda ash. Also required are the necessary labeling and coloring materials. Because of the need for careful packing for shipment to customers, corrugated cartons are used to pack the containers.

Cost of labor is the major factor in determining glass container prices. The corrugated shipping container represents 18–20% of the cost of the final product as shipped. Glass containers are generally sold on a delivered price basis with freight included in the price.

The Census Bureau publishes data as to glass container shipments. These statistics are grouped in terms of end use, in the following fourteen categories: [28]

Narrow Neck: Food, medicinal and health supplies; household and industrial; toiletries and cosmetics; beverage, returnable; beverage, non-returnable; beer, returnable; beer, non-returnable; liquor; and wine.

Wide Mouth: Food, including fruit jars and jelly glasses; medicinal and health supplies; household and industrial; toiletries and cosmetics; dairy products; and packer's tumblers.

28. The statistics are collected for the Bureau by the industry trade association, the Glass Container Manufacturers Institute, from its member manufacturers and are used as the industry totals. A number of manufacturers are not members of the Institute. Statistics are prepared on a physical volume basis measured in gross. They show container shipments by product groups as classified by the Institute with a basic division between narrow neck and wide mouth containers. It may be noted that the Institute's descriptions of the different end use categories (G–1205) are slightly different from those which Census apparently used. The Government relied on the latter, however, and I have used them here.

Each of these general end use categories is composed of hundreds of individual end use items. But no detailed breakdown figures on the end use categories are available.

(c) *Plastic containers.*

Plastic containers are manufactured by various methods including blow molding and injection molding. They are made of such raw materials as polyethylene and polystyrene. Prices are principally determined by the price of raw materials. Some are sold on a delivered price basis and some are not.

Plastic containers have distinct physical characteristics. They are neither rigid nor transparent. They are not impermeable to gases, and cannot be hermetically sealed. Such containers are virtually unbreakable, but they cannot contain internal pressure and their ability to hold a vacuum is limited. They are lighter in weight than glass containers and appear to be smaller than glass containers of equal capacity. They are electrostatic and therefore attract dust.

Plastic containers are of many shapes and sizes and include such items as bottles, jars, tubes, vials and bags. They are used to package many kinds of foods, drugs, cosmetics, detergents and industrial products including such widely diverse products as rust removers, baby lotions, ice cream, insect repellents, shoe polishes, pills, water and deodorants.

(2) *Separate industries.*

(a) *The metal can industry.*

This industry is composed of companies engaged in the manufacture of metal cans used to pack a large number and wide variety of different products. Most of the companies in the industry manufacture cans for sale to industrial and agricultural processing customers who, in turn, use them to pack their own products for marketing. Some companies, on the other hand, the so-called captive companies, produce cans for their own use in packing their own products.[29] Some of the captive companies produce cans for their own use and also sell to other users.[30]

A number of metal can manufacturers also manufacture tinware and other tin plate products. Some also produce other kinds of packaging materials and incidental items.

There are no reliable figures in the record as to the number of companies engaged in the manufacture of metal cans in the United States. Estimates run from seventy-five to over ninety. The largest is American Can Company. Continental is second. Either Campbell Soup (a captive manufacturer) or National Can Company is third. Other important manufacturers include Crown Cork & Seal Company, Heekin Can Company, J. L. Clark Company, Carnation Milk and Sherwin-Williams. American Can, Continental, National Can and Crown Cork & Seal, among others, sell cans throughout the country. Most of the other companies operate on a regional basis.

American Can, the industry leader, like Continental, manufactures a variety of products used by packers. In addition to metal cans it produces fibre, plastic and paper containers. It also manufactures machines for filling and closing both metal and fibre containers. Various other companies manufacturing metal cans also have diversified product lines.

In 1955 American Can shipped approximately 38% of the metal cans sold in the United States. Continental's shipments amounted to approximately 33%. American's shipments exceeded Continental's in nine of the thirteen Census categories. Together these two companies accounted for approximately 71% of the total metal can shipments in the country.

It appears that can companies sell their products directly to users. There is nothing to indicate that there are any

29. Such companies include Campbell Soup Company, H. J. Heinz Company, Hollingshead Corporation, Pet Milk Company and Otoe Food Products Company.

30. Among these are Armstrong Paint Company, Sherwin-Williams Company, The Borden Company and Carnation Milk.

jobbers or wholesalers who purchase cans for resale to their own customers and it may be assumed that there are none.

The trade association for this industry is the Can Manufacturers Institute. Its forty-nine members, limited to can manufacturers, include American, Continental, National, Crown, Heekin and Clark. Voting rights and representation on the Board are determined by the number of employees of the member companies.

The Institute has a professional staff of three. Its activities, carried on largely through committees, deal with various technical industry problems such as industrial relations, traffic, safety and research and include a limited amount of promotion on the advantages of the metal can.

A promotion and advertising program, jointly financed by the members of the Institute and tin plate manufacturers who supply raw materials for can manufacture, was carried on at one time. The program was dropped when the tin plate manufacturers withdrew financial support. A recent program of advertising to promote soft drinks in cans was not conducted by the Institute but was financed exclusively by tin plate manufacturers.

Since 1957 the Institute has done no advertising and its only promotion work has been in connection with the celebration of the sesquicentennial of the tin can. The extent of the activities of the Institute and the effects, if any, which such activities may have upon the industry or upon the public are not reflected in the record.

The annual production of cans has increased substantially since the end of World War II when the industry resumed its normal rate of growth after wartime curtailment of metal supply. Its facilities have also expanded substantially and continue to do so.

Since 1950 American and Continental have substantially maintained their market positions as the number one and number two companies in the industry respectively. However, the medium sized producers, with assets of less than $100,-000,000 have not only participated in the growth of the industry but have increased their share in the market. The evidence did not show that there has been any reduction in the number of companies manufacturing cans since the Hazel-Atlas acquisition and, in fact, the number of companies engaged in the "Tin Can and other tinware industry" [31] was greater in 1957 than in 1950.

It did not appear that the initial capital investment needed to embark upon can manufacture is unreasonably high, that there is any obstacle to obtaining whatever technical knowledge is necessary or that there are any patent barriers to entry into the industry. Raw materials are plentiful and readily available.

There was little in the record as to the shape and pattern of the industry in terms of such factors as the markets which it serves, the nature of the competition which exists in such markets, pricing practices, its methods of buying, selling and merchandising, the supply and demand picture or similar matters.

From all that appears the industry is prosperous, healthy and highly competitive. Competition has been and remains keen and vigorous. What the record presents is a generalized picture of a large, strong, and relatively stable but expanding metal can industry.

(b) *The glass container industry.*

This well-defined and recognized separate industry is composed of companies engaged in the manufacture of glass containers sold to industrial and agricultural customers for use in packing their own products. Glass containers are also sold to the public for home preserving.

The industry produces glass containers of a wide variety of types, shapes, sizes and colors for numerous end uses. A number of companies, including Owens-Illinois Glass Company and Hazel-Atlas, also produce glass table and kitchen ware

---

31. This is an Internal Revenue Service classification.

and other glass products. Some also produce other products used by packers.

There are at least forty-two companies engaged in the manufacture of glass containers. By far the largest is Owens-Illinois Glass Company with almost 35% of the total production and with annual sales in 1955 of some $370,000,000 and earnings of some $27,000,000.[32] Anchor-Hocking Glass Company, Hazel-Atlas and Knox Glass, Inc. appear to follow in that order. The Hazel-Atlas share of the glass container market in 1955 was about 9.6% with net sales of some $79,000,000 and net earnings of approximately $3,000,000.

Owens-Illinois, in addition to glass containers, manufactures plastic containers, metal and plastic closures, corrugated shipping containers, various types of fibre and paperboard containers, closure machinery and a wide variety of other glass and plastic products. Other companies, such as Anchor-Hocking, also have diversified lines.

There are at least twenty companies in the industry with sales above or in the neighborhood of $10,000,000 a year. Most of these companies have been expanding their facilities and production and increasing sales at a rapid rate. There is nothing to indicate that smaller companies are not also prospering.

Five companies in the industry sell throughout the country. They are Owens-Illinois, Anchor-Hocking, Thatcher Glass Mfg. Co., Ball Bros. Co., Inc., and Hazel-Atlas. Other companies sell on a regional basis.

The trade association for the industry is the Glass Container Manufacturers Institute. Its membership consists of thirty-six glass container manufacturers, six closure manufacturers and twenty suppliers of raw materials and equipment.[33] Dues are assessed on the basis of sales volume and the Board of Trustees is composed of employees of the member companies.

The Institute has about forty-five paid employees. Its activities are carried on by standing committees. Members of the professional staff are assigned to each committee.

Activities include market research and promotion, the collection and dissemination of statistics concerning the industry, technical research, package design and specifications, the development of standard testing and quality control procedures, problems of freight rates, labor relations, and liaison work with government. The Institute does advertising and publicity for the industry but the evidence does not indicate how substantial this is or how effective such activities are.

As in the case of the metal can industry, there is virtually nothing in the record of significance regarding such matters as the markets served by the industry, the nature of the competition which exists in such markets, the problems faced by its customers, methods of selling and merchandising, price structure or pricing practices, the supply and demand picture, or similar matters.

During World War II the tin plate supply was greatly curtailed and the glass container industry was able to make substantial advances at the expense of the metal can industry. Since the war the glass container industry has continued its substantial growth and expansion and this process has not abated since the Hazel-Atlas acquisition. The growth of the glass industry has been more rapid than that of the can industry.

Numerous technical improvements have been made in the glass container which have increased its strength, resistance to breakage and overall utility,

---

32. These figures apparently include all of the products manufactured by Owens-Illinois and are not confined to glass container sales. The Hazel-Atlas figures are also inclusive but Hazel-Atlas, unlike Owens-Illinois, did not have widely diversified product lines.

33. A number of manufacturers are not members of the Institute, including Star City Glass Co., Wheaton Glass Co., T. C. Wheaton Co., Kerr Glass Manufacturing Co., Underwood Glass Co., Arkansas Glass Co., and Gallo Glass Co.

and have lightened weight. These improvements have contributed significantly to the growth of the industry.

There appears to be no difficulty in entering the glass container industry and a number of new companies have recently entered and have had successful operations. There has been a continuous expansion of facilities by both large and small companies through new plant construction or additions to existing plants.

There was no evidence that the initial capital investment needed to enter the industry was unreasonably high or that there is any obstacle to obtaining whatever technical knowledge or facilities are necessary. Nor are there any patent barriers to entry. Raw materials are plentiful and readily available, as are shipping containers.

The industry is prosperous, healthy and highly competitive. Here again is a generalized picture of a large, strong, and rapidly expanding industry in which competition has been and remains keen and vigorous.

(c) *The plastic container industry.*

The plastic container industry is relatively new. It got under way in the mid 1940's. The industry has since grown rapidly and is still undergoing rapid expansion. Neither the size and scope of the industry nor the respective positions of Continental and other manufacturers in it can be determined with any reasonable degree of accuracy from the evidence in this record.

The larger companies in the industry include Plax Corporation, Injection Molding Company, American Can, Continental, Royal Manufacturing Company, Inc., Owens-Illinois, Wheaton Plastics Company and Foster-Grant Company, Inc.

The dollar sales volume of the industry is small compared with that of the metal can and glass container industries. Plax, the largest producer, had plastic container sales in 1959 of about $12,000,000, which it estimated to be 30% to 40% of such sales in the United States.

In 1955 Continental's sales of plastic containers amounted to $2,400,000, and according to its estimate it shipped approximately 9.3% of the plastic squeeze bottles sold in the United States in that year.

There are apparently thousands of small companies engaged in the manufacture of plastic containers. Some use the blow molding method of manufacture and others use injection molding.

Among the many types of plastic packaging materials produced by companies in the industry are bottles, jars, vials, boxes, folding cartons, tubs, tubes, carboys, tubes with metal ends, film and other flexible materials and bags. These containers are sold to a wide variety of industrial customers who pack their own products.

There is a Plastic Bottle and Tube Manufacturers Institute, organized in 1957, which is a division of the Society of the Plastics Industry, Inc. Its members are American Can, Continental, Foster-Grant, Injection Molding, Plax and Royal.

There was a paucity of information in the record about the activities of this Institute. It appears to collect statistics from its members, some of which apparently are published by the Department of Commerce but these figures are not in the record. Such statistics as are collected by the Institute concerning individual companies are destroyed when received and only overall totals are maintained. The Bureau of Census does not collect or publish statistics relating to the production of plastic containers.

There is no showing that the initial capital investment needed to enter manufacture of plastic containers is high. Nor are there any technical obstacles to such manufacture. Raw materials and labor are readily and plentifully available and patents constitute no barrier to entry into this field.

The number of companies manufacturing plastic containers is on the increase and has continued to increase since the acquisition. The industry is rapidly expanding and competition is keen and vigorous. There are no universal figures

for the industry in the record and such statistics as there are concerning it are wholly unreliable and furnish no basis from which informed conclusions can be drawn.

This relatively new and expanding industry plainly has substantial potential. However, its overall dimensions and the extent to which it may be in competition with the glass container and metal can industries remain, at best, obscure.

### (3) *Closures.*

The term "closures" refers to a miscellany of devices used by packers to close and seal containers in which products are packed. The various types include crown caps, vacuum type closures, screw and lug type closures, paper and foil caps, and closures for home canning. Some are made of tin plate, some of aluminum or plastic, and others of paper or foil.

As I mentioned earlier, prior to the acquisition Continental produced crown caps and, after acquiring White Cap Company, vacuum type metal closures as well through that subsidiary. Hazel-Atlas did not manufacture either of these products. It manufactured screw and lug type metal closures and home canning closures. Continental did not.

(a) Crown caps are made of tin plate with cork or composition lining. They are used to close narrow neck glass bottles, primarily for beer and carbonated beverages. They are applied to the bottle by crimping and not by lugs or threads. They are not sold in competition with screw or vacuum type metal closures.

The largest producer of crown caps was Crown Cork & Seal Company, which was also a metal can producer. Other producers, in addition to Continental, were Armstrong Cork and Guttman. Though Anchor-Hocking and Owens-Illinois did not manufacture crown caps at the time of the acquisition, both of them had been for some time large manufacturers of beer bottles and beverage bottles.

In 1956 Continental shipped 17.1% of the crown caps sold in the United States, in 1957 18.4% and in 1958 18.5%.

(b) Vacuum type metal closures are made of tin plate or aluminum, with various kinds of linings. They may be of the side-seal, top-seal (or twist-off) or roll-on varieties. They are used on glass containers almost entirely for packing food.

Vacuum type metal closures are applied by closing machines which create a vacuum in the head space of the container. The products to be packed are sterilized and steam is inserted into the area remaining between the food and the top of the jar, thus exhausting the air in the head space. The closure is then applied and when the product cools and the steam evaporates a vacuum seal is created.

Closing machines for the application of vacuum metal closures are leased or sold to packers by Continental through its White Cap Division and also by Owens-Illinois, Anchor-Hocking and Aluminum Company of America. Vacuum closing machines for a particular type of vacuum closure made by different manufacturers, are interchangeable with similar machines made by other manufacturers, or may be made so with relatively minor modifications. Such machines cannot be used to apply screw type metal closures and they operate at much higher speeds than machines for the application of screw type closures.

The White Cap Company, now subsidiary of Continental, is the leading manufacturer of vacuum type closures. Other manufacturers include Anchor-Hocking, Owens-Illinois and Crown Cork & Seal. In 1956 White Cap produced approximately 60% of the vacuum closures made from tin plate. A recent development, apparently pioneered by White Cap, is the twist-off vacuum closure which is used for the same general purposes as other vacuum closures.

(c) Some screw and lug type metal closures are made of tin plate with vari-

ous kinds of linings. Others are made of aluminum or plastic. It does not appear that screw and lug type closures made of different materials have end uses substantially different from one another. Closures of this type are normally used on glass containers.

These closures engage the glass container by screwing into continuous threads in the neck of the container. They cannot be used where a vacuum is required and in general are not used for food products for which vacuum metal closures are needed because of spoilage problems. Screw and lug type closures are used on both food and non-food products.

There are at least 18 companies manufacturing screw and lug type metal closures, including Owens-Illinois, Crown, Ball Bros. and Hazel-Atlas. In 1958 Hazel-Atlas produced approximately 4.7% of the screw and lug type metal closures shipped in the United States. There are several companies, including Owens-Illinois, which manufactured both metal and plastic type screw and lug type closures, the uses of which appear to be substantially interchangeable. From 24 to 36 companies make plastic screw type closures.

The statistics in the record relating to closures do not include metal closures used in home canning, aluminum closures, plastic closures or paper caps, though Hazel-Atlas made home canning closures as well as screw and lug type closures for commercial packing. With the exception of home canning jars sold with closures attached, glass containers and closures for them are sold separately. Closures are sold by the manufacturer directly to packers and there appear to be no wholesalers or jobbers of these products. Closure customers generally have multiple

sources of supply. There is no evidence that prices of one type of closure have any effect on the sales volume of any other types.

There is no shortage of raw materials necessary to manufacture closures. There was no showing that there were any substantial obstacles to entry into any of the closure fields.

Crown caps, vacuum type closures and screw and lug type closures have in the main quite different uses and do not significantly compete with one another. However, competition within each of the respective screw type, vacuum type and crown cap fields has been and remains keen and vigorous and there does not appear to have been any significant diminution in the number of companies engaged in these respective fields either before or after the acquisition.

### IV.

THE CONTENTIONS OF THE PARTIES.

(1) *Lines of commerce and sections of the country claimed to be relevant.*

A year and a half before the commencement of the trial, the Government, in answer to defendants' interrogatories, specified with particularity ten separate lines of commerce which it claimed were adversely affected by the acquisition under attack. The lines of commerce so specified remained unchanged throughout the exhaustive pre-trial proceedings in which the issues to be tried were carefully limited and defined, and during the six weeks of the trial itself.

The ten lines of commerce are as follows: [34]

1. The packaging industry.
2. The can industry.
3. The glass container industry.

Containers for the soft drink industry. 4. Containers for the toiletries and cosmetics industry. 5. Containers for the medicine and health industry. 6. Containers for the household and chemical industry. 7. The can industry. 8. The glass container industry. 9. Metal closures. 10. The packaging industry.

34. The lines of commerce are listed here in what seems to me to be the logical order in which they should be discussed. The order in which they were listed by the Government in its interrogatories, which I followed in my oral decision, was as follows:
 1. Containers for the canning industry.
 2. Containers for the beer industry. 3.

4. Metal closures.
5. Containers for the beer industry.
6. Containers for the soft drink industry.
7. Containers for the canning industry.
8. Containers for the toiletries and cosmetic industry.
9. Containers for the medicine and health industry.
10. Containers for the household and chemical industry.

The Government contended that the relevant geographic market in which adverse effects of the acquisition were felt in each of these ten lines of commerce was the United States as a whole. It contended also that in lines of commerce numbered 2, 3, 5, 6, 7, 8, 9 and 10 there were adverse effects in two separate sections of the country, as well, (a) the United States east of the Rocky Mountains, and (b) the United States west of the Rocky Mountains.

■■■ No discussion of the attempted distinction between the areas east and west of the Rocky Mountains is necessary here. The evidence wholly failed to establish that, in the context of this case, there were any differences between these areas or between either of them and the United States as a whole indicating that they constituted economically significant separate geographic markets in any of the lines of commerce specified. Nor was there evidence that such effects of the acquisition as might be felt were any different in different sections of the country. The only "section" of the country which was relevant was the United States as a whole. That is the geographic market with which we are concerned here.

The defendants agreed with the Government that the can industry and the glass industry were separate lines of commerce for Section 7 purposes. They contended, however, that the other eight lines of commerce specified did not in fact exist and that there were no such separate relevant product markets or submarkets.

Hazel-Atlas, said the defendants, was engaged in two lines of commerce, glass containers and screw and lug type metal closures and these were the only relevant markets in so far as it was concerned. They said further that the only relevant product markets in which Continental was engaged were metal cans, plastic bottles, crown caps and vacuum type closures.

Thus defendants contended that there were but six separate and distinct relevant lines of commerce or product markets. Moreover, they took the position that the lines of commerce in which Hazel-Atlas and Continental were respectively engaged, were quite different and did not overlap to any significant degree.

(2) *Claims as to anti-competitive effects.*

The Government conceded that it had no proof that any person or firm, seller or buyer, suffered any actual injury as a result of this acquisition, although the trial took place more than three and a half years after it occurred. There were no complaining witnesses. None of the 78 witnesses whom the Government placed on the stand testified to any actual anti-competitive effects or tendency to monopoly. There was no evidence of actual anti-competitive effects or tendency to monopoly in this record.

The Government's case was predicated upon what it claimed were potential anti-competitive effects.

As its standards for determining whether such effects were reasonably probable, the Government advanced four criteria referred to in the House Report on the 1950 amendment to the section.[35] It claimed that the acquisition (1) had eliminated in whole or in material part the competitive activity of Hazel-Atlas which had been a substantial factor in competition with Continental; (2) had increased the relative size of Continental to such point that its advantage over its competitors threatened to be decisive;

35. H.R.Rep. No. 1191, 81st Cong., 1st Sess., 8.

(3) had resulted in an undue reduction in the number of competing enterprises; and (4) had established relationships between buyers and sellers which deprived their rivals of a fair opportunity to compete.

The Government also stressed a statement in the Senate Report on the 1950 amendment that the statute was intended "to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding. * * * " [36] It emphasized prior acquisitions by Continental of companies in the metal can and other fields, and urged that when Continental acquired Hazel-Atlas, the process of acquisition had reached a stage where it was reasonably probable that anti-competitive effects would occur and that the acquisition was therefore unlawful.

The Government took the position that, while the anti-competitive effects referred to in the House Report might not be apparent presently, it was probable that they would occur in the future in each of the lines of commerce which it attempted to delineate.

Defendants, on the other hand, while conceding that the criteria referred to in the House Report might be relevant considerations in an appropriate Section 7 case and that, in appropriate circumstances, a continuing process of cumulative acquisition might become unlawful, insisted that there was no substitute for a showing that there be reasonable probability of substantial anti-competitive effects or tendency to monopolize in the product markets relevant to the case under consideration. They pointed out that the intention of Congress to cope with restraints of trade and monopolistic tendencies in their incipiency was carried out by the concept of reasonable probability embodied in the statute and that this was the sole standard to be applied to the particular facts of each case.

Defendants also pointed out that Section 7 cannot be applied mechanically or quantitatively but that each case must be decided on its own facts. They maintained, moreover, that in any event, the Government could not prevail since there was a complete failure of proof here.

They urged that Hazel-Atlas and Continental did not compete with one another to any significant degree and there was no reasonable probability that they ever would; that the merger was utterly devoid of anti-competitive significance; and that it had not resulted and there was no probability that it would result in any substantial lessening of competition or tendency toward monopoly in any of the lines of commerce delineated by the Government or in any other lines of commerce.

## V.

### UNCOMMON FEATURES OF THE CASE.

This case does not fit into any of the classic anti-trust patterns. It deals with three separate and distinct industries manufacturing separate and distinct types of products.

As the earlier discussion indicates, each type of container is made from different raw materials and each has different physical characteristics and properties. Different plant and machinery are required for each and the processes of manufacture are different. The different types of containers manufactured by these different industries are of wide varieties of sizes and shapes and are put to hundreds, if not thousands, of different end uses.

Concededly there was substantial and vigorous inter-industry competition between these three industries and between various of the products which they manufactured. Metal can, glass container and plastic container manufacturers were each seeking to enlarge their sales to the thousands of packers of hundreds of varieties of food, chemical, toiletry and industrial products, ranging from ripe olives to fruit juices to tuna fish to smoked tongue; from maple syrup to pet food to coffee; from embalming fluid to

---

36. S.Rep. No. 1775, 81st Cong., 2nd Sess. 4.

floor wax to nail polish to aspirin to veterinary supplies, to take examples at random.

Each industry and each of the manufacturers within it was seeking to improve their products so that they would appeal to new customers or hold old ones. Hazel-Atlas and Continental were part of this overall industrial pattern, each in a recognized separate industry producing distinct products but engaged in inter-industry competition for the favor of various end users of their products.

It does not necessarily follow from this, however, that the acquisition of Hazel-Atlas by Continental falls within the ambit of Section 7 of the Clayton Act. That section of the Act deals specifically with relevant product markets and the lessening of competition within them. The fact that there is inter-industry or inter-product competition between metal, glass and plastic containers is not determinative of the metes and bounds of a relevant product market.

As the Supreme Court said in the Cellophane case: [37]

"Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another. For example, one can think of building materials as in commodity competition but one could hardly say that brick competed with steel or wood or cement or stone in the meaning of Sherman Act litigation; the products are too different. This is the interindustry competition em-

phasized by some economists. See Lilienthal, Big Business, c. 5." [38]

Thus the relevant product market for anti-trust purposes by no means includes all substitutes. In this connection the Court said in the Times-Picayune case: [39]

"For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small."

This appears to be what the Court had in mind in Brown Shoe when it said: [40]

"The outer boundaries of a product market are determined by the *reasonable* interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." (Emphasis added.)

In this case the circle referred to in Times-Picayune cannot be drawn to include within the boundaries of a single product market the metal can, glass container and plastic container industries and their wide variety of products. Attempts by the Government here to combine these separate industries and their products or to combine separate and distinct products from separate and distinct industries into single product markets necessarily failed because appropriate distinctions were not made between inter-industry or overall commodity competition and the type of competition between products with reasonable inter-

37. United States v. E. I. DuPont de Nemours & Co. (Cellophane), 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956). See also Kansas City Star Company v. United States, 240 F.2d 643 (8 Cir.1957), cert. den. 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957).

38. Illustrations of inter-industry competition given in Lilienthal, Big Business: A New Era (1952), c. 5, referred to by Mr. Justice Reed, include copper and aluminum; coal and oil; cotton, wool and

synthetic fibres; trucks, automobiles, buses and airplanes; iron, copper and plastic pipe; glass, concrete, brick and asbestos building and insulation materials; and *even glass, cans, and plastic bottles.*

39. Times-Picayune Publishing Co. v. United States, 345 U.S. 594 (1953) at p. 612, fn. 31, 73 S.Ct. 872, at p. 882, 97 L.Ed. 1277.

40. Brown Shoe Co. v. United States, supra, 370 U.S. p. 325, 82 S.Ct. p. 1523.

changeability of use and cross-elasticity of demand which has Clayton Act significance.

■ The boundaries of a product market or sub-market may only be determined "by examining such practical indicia as industry or public recognition of the [market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." [41]

Nevertheless, the Government here has made an attempt to establish a product market embracing all of these separate industries and products and many more in the line of commerce which it denominated as the packaging industry. The theory upon which it proceeded on this line of commerce is illustrative of its failure to make the distinctions I have pointed out.[42]

Moreover, with the exception of the lines of commerce denominated as the metal can industry and the glass container industry, each of which were conceded to be separate product markets and the line denominated "containers for the beer industry" which I have found to be a separate product market, the Government also ignored these concepts in attempting to combine products produced by separate industries, which were not shown to have reasonable interchangeability of use or cross-elasticity of demand, into relevant lines of commerce. Examination of such practical indicia for determining product markets as were in the record did not establish that there were such lines of commerce. These lines of commerce were artificially carved out by the Government and did not conform to the realities of the marketplace.

We therefore do not have here the pattern of a horizontal combination between two companies which manufacture or sell the same products, as the Government seemed to assume. Nor are we concerned with the pattern of a vertical combination. Neither Continental nor Hazel-Atlas was engaged in any essential step in the processing, manufacture or sale of products made or used by the other.[43]

What we have here, basically, is a conglomerate combination in which one company in two separate industries combined with another in a third industry for the purpose of establishing a diversified line of products suitable for a variety of end uses to be sold to a wide range of customers with differing packing requirements.

"Such a merger * * * does not have the effect of automatically foreclosing to competitors any market outlet or source of supply as in a vertical merger, nor does it have the effect of automatically eliminating a competitor as in a horizontal merger." [44]

Here the Government moved into virtually uncharted Section 7 territory. In the twelve years since Section 7 was amended there are apparently only two other cases raising this exceptional problem. They are United States v. General Motors (Euclid Road Machinery) which is currently pending in the District Court for the Northern District of Ohio, and the Procter & Gamble case before the Federal Trade Commission which has just been cited. A third case, United States v. General Dynamics, filed in this district on November 8, 1962 and as yet undetermined, may also involve the same problem to some extent.

To complete the background I should add that I have been unable to find any case dealing with a pattern of inter-industry and inter-commodity competi-

---

41. Brown Shoe Co. v. United States, supra, p. 325, 82 S.Ct. p. 1523.

42. See discussion of "The packaging industry", p. 787 infra.

43. But see discussion of corrugated shipping cartons, infra, p. 792 and containers for the beer industry, infra, pp. 794–796.

44. Procter & Gamble Co., 3 C.C.H. 1961 Trade Reg. Reports (¶15,245; F.T.C. Orders), at p. 20,257.

tion comparable to that which exists here nor in which the diversification of products, industries and consumers is so pervasive.

This is not to suggest that enforcement of Section 7 may not be extended beyond the range of any of the cases thus far decided. For, as both Brown Shoe and the legislative history which it reviews make clear, Section 7 is applicable to conglomerate mergers where the facts warrant.[45] But there must be evidence that the facts warrant such application.

Understandably the case of a conglomerate merger set in such a complicated inter-industry pattern as this presented great difficulties of proof for the Government. But that does not mean that the Government's burden was lessened or that it was relieved from the obligation of establishing relevant product markets or of showing reasonable probability of substantial anti-competitive effects in one or more of them as a result of the acquisition. In fact, in the case of a conglomerate merger such as this, where such a wide diversity of factors bear on questions of relevant markets and anti-competitive effects within them, the Government must be at pains to examine in detail all practical indicia which might bear on both questions.[46]

In the case at bar the Government not only failed to do this but the evidence concerning such indicia as were examined was woefully inadequate. Even assuming that the theory upon which the Government sought to construct its line of commerce for the packaging industry, for example, were tenable, it conspicuously failed to adduce any evidence whatsoever to support its theory, as I shall point out in detail later. In the lines of commerce denominated containers for the soft drink, canning, toiletry and cosmetic, medicine and health, and household and chemical industries, moreover, its proof was also altogether deficient as to practical indicia showing that such product markets as these in fact exist. It failed to establish that these were relevant lines of commerce.

The Government's failure of proof was not confined to its attempted delineation of end use and other lines of commerce. Its failure was equally evident with respect to anti-competitive effects in the can industry, the glass industry and the beer container lines of commerce which it was successful in establishing.

Plainly, in order to make out a case under the Act the Government was required to show either that the acquisition had actually resulted in a significant diminution of the vigor of competition or that there was reasonable probability that it would do so. Unless it showed that there were actual anti-competitive effects of a substantial nature, which it did not, the reasonable probability test had to be met. As I have mentioned, there is no evidence of actual anti-competitive effects in this record, substantial or otherwise and the Government did not proceed on that theory.

Thus, the Government had to establish the reasonable probability of substantial anti-competitive effects from this acquisition and it had to do so under the facts and circumstances of this case and within the framework and context of the industries and markets specifically involved.

The Government was not able to sustain this burden. Its case was based

---

45. Brown Shoe Co. v. United States, supra, 370 U.S. p. 317, 82 S.Ct. p. 1519.

46. The comments of the Federal Trade Commission with respect to the standards of proof required in such a situation are not inappropriate:

"* * * the same tests apply as in any other matter coming within the purview of Section 7, but since a conglomerate acquisition does not have the above-mentioned 'automatic' effects of a vertical or horizontal merger, such a determination is necessarily difficult to make from a consideration of evidence relating solely to the competitive situation existing in the relevant market prior to the acquisition and to the pre-merger status of the acquired and acquiring corporations. Consequently, a consideration of post-acquisition factors is appropriate [as well]." Procter & Gamble Co., supra, p. 20,258.

on what it claimed to be anti-competitive effects which *might* occur in the future. No doubt if the evidence here had shown that there was a reasonable probability that future effects of a substantial nature would occur, sufficient would have been shown to make out this element of the case.[47] But no such showing was made. It is a far cry from *might* occur to a reasonable *probability* of occurring.

Reasonable probability of the lessening of competition in the future is just as much subject to evidentiary proof as is actual lessening of competition. Mere speculation or conjecture cannot be substituted for proof of reasonable probability. Nor are mere possibilities that competition might be lessened in the future, or inferences to that effect, sufficient.

In the absence of evidence of reasonable probability of anti-competitive effects the Government has speculated as to what might occur and has substituted what are at best mere possibilities for reasonable probabilities.

For example, the Government laid great stress throughout on prior acquisitions by Continental and urged that the overall history of such acquisitions impels the conclusion that the Hazel-Atlas acquisition was repugnant to the statute.

It is plain that the Act requires intervention in a cumulative process of acquisitions where the effect may be a significant reduction in the vigor of competition in any line of commerce.[48] But this cannot be assumed. It can only be established by showing that such effects had in fact occurred or that it was reasonably probable that they would. There is no such proof in this record.

The evidence as to prior acquisitions here is confined to two documents which were answers by Continental in 1946 and in 1956 to inquiries made by the Government and passing references in a letter in which Continental outlined to the Anti-Trust Division its position with respect to the proposed acquisition of Hazel-Atlas.[49] All that these documents show is that Continental has, over a period of many years, acquired a substantial number of companies, or portions of companies, in a wide variety of businesses.

Many of the acquisitions were made a number of years ago in the 1920's and the 1930's. Many were extremely small. Some were the result of liquidation sales. Some appear to have been cleared with the Department of Justice or to have had its tacit approval. Some were located in Canada. Some of the companies acquired were subsequently sold.

None of the companies acquired in the ten years prior to suit were can companies. No glass company had ever been acquired before. As I will point out a little later, the objectives of the acquisitions carried out over the last ten years at least, and of a number before that, were to diversify Continental's product lines.

The Government did not show what the effects of any of these acquisitions were, cumulative or otherwise. There was no evidence that they had any anti-competitive effects in any of the industries or product markets to which they were related. The Government's conclusion that anti-competitive effects will necessarily flow from this merger because of Continental's prior acquisitions is pure conjecture, unsupported by evidence.

Indeed, such evidence as there is tends to negative such a conclusion. Continental's letter to the Anti-Trust Division, outlining its position with respect to the proposed acquisition,[50] states its purposes and intentions in making the acquisition.

■ Plainly, purpose and intention are not in any way controlling in a Section 7 case. But purpose and intention

47. Brown Shoe Co. v. United States, supra.

48. Brown Shoe Co. v. United States, supra pp. 318, fn. 32, 333–334, 345, fn. 72, 82 S.Ct. p. 1520, 1528–1529.

49. G–785, G–786, G–900.

50. G–900.

are factors which may be taken into account together with all the other factors in the case in predicting the probable future conduct of the parties and the probable effect of the merger.[51] Viewed in that context purpose and intention may throw some light on the effects which might reasonably be anticipated from the merger.

The Government placed heavy reliance on Continental's letter stating the purpose of the acquisition. As expressed in that letter the purpose was a further diversification of Continental's various lines of products to include for the first time a glass container division.

The history of prior acquisitions by Continental indicates its design to diversify increasingly so as to be able to maintain independent lines of various kinds of materials used by packers of many kinds of products and to service a wider variety and number of customers. As a result of this program, apart from metal cans, other products which it had come to produce included fibre drums, kraft liner board, flexible packaging materials, plastic containers, crown caps, vacuum type metal closures, various types of can and closure machinery, paper cups and plates, and steel pails. By the acquisition of Hazel-Atlas, Continental further diversified its product lines to include glass containers and other glass products, screw and lug type metal closures and home canning closures.

There was no evidence that Continental's program of diversification resulted in the suppression of new lines which it acquired. Nor was there evidence that competition in these lines was curtailed or that any pressures, either directly or indirectly, were brought in any of them which tended to create any anti-competitive effects. Though the case was tried almost four years after the acquisition, far from indicating that there had been any such post-acquisition effects, the evidence was to the contrary. This is especially significant in the case of a conglomerate merger such as this.[52]

The announced, and, indeed, actual policy which Continental followed was to encourage development of the new lines in separate corporate divisions and to promote intra-company competition so as to strengthen its overall ability to compete with other companies in the different industries and different product lines in which it was doing business.

There are no indications in the record that the acquisition tended either to weaken the position of Hazel-Atlas as a competitive factor in the glass industry or in any of its product lines, or to weaken Continental's position as a competitive factor in the metal can industry or in its product lines. Nor is there anything to show that such positions were so strengthened as to have any significant anti-competitive effects in any of the industries or markets involved here.

In the light of the situation in the metal can and glass container industries, the apprehension expressed by the Government that Continental was likely to eliminate or limit the manufacture of glass containers after the Hazel-Atlas acquisition or to eliminate or limit some of its can lines, is not only unsupported by the evidence but also unfounded. In fact any such course would have run counter to Continental's concept of the theory and purpose of its diversification program.

The Government views with alarm every advantage which Continental or Hazel-Atlas might gain as a result of the merger and sees in each the spectre of anti-competitive effects. But the mere fact that the competitive position of acquiring or acquired companies may be improved by a merger does not establish that the merger is harmful or has any of the proscribed anti-competitive effects.[53]

51. Brown Shoe Co. v. United States, supra, p. 329, fn. 48, 82 S.Ct. p. 1526.

52. Procter & Gamble Co., supra, p. 20,258.

53. Brown Shoe Co. v. United States, supra, pp. 319–320, 82 S.Ct. p. 1521. See also Address by Attorney General Robert Kennedy, Economic Club of New York, Nov. 13, 1961.

The test is not whether, as a result of a merger, either the acquired or acquiring company obtains advantages which help it to compete more effectively. Obviously were this so, any merger permitted under the Act could have no sound business justification. The object of the Clayton Act is not to discourage businesses from taking steps to compete more effectively but to keep competition vigorous and effective. Opportunities to offer improved products, to make cost reductions or to give better service to customers are not in themselves indications of anti-competitive effects. These are all legitimate business objectives. "It may well be that by effecting a better arrangement for a more profitable undertaking * * * competition would be stimulated rather than lessened." [54]

Thus, the Government could not have succeeded here merely by showing that there were competitive advantages accruing to the acquiring or acquired companies or both from the merger. It is the *anti*-competitive effects of the merger with which the statute is concerned—that is to say, the lessening of the vigor of competition, rather than the converse. Competitive advantages are not proscribed unless there is a reasonable probability that anti-competitive effects of some significance in the relevant product markets will result. No such showing was made.

The Government also contended that "concentration" in the industries and product markets involved resulted from the merger which should be considered as a key factor in establishing that there was reasonable probability of anti-competitive effects or tendency to monopoly.

 Concededly Continental was a very large corporate entity. So to a much lesser degree was Hazel-Atlas. They stood second and third respectively in their industries and each had substantial shares in different product markets.

It is not to be doubted that size and market shares are factors to be taken into account in determining anti-competitive effects and tendency to monopolize. But mere size or concentration alone are not decisive. As the Supreme Court has said, exclusively mathematical tests are to be avoided. [55]

Such tests are particularly inapposite where a conglomerate merger is under scrutiny. In such a situation the Supreme Court's stricture that the merger must be "functionally viewed, in the context of its particular industry" [56] becomes especially meaningful.

 A conglomerate merger does not result in the elimination of a competitor but merely substitutes the competition of the acquiring company for that of the acquired company in the lines of commerce in which the acquired company was formerly engaged. Thus, such a merger does not in itself result in any increase in industry or product market concentration and the shares of the acquiring and acquired companies in their respective product markets are the same as they were before.

Of course, if the product markets served by the acquiring and acquired companies are closely tied together, it is possible that substantial competitive advantages may accrue which could result in changes of market positions. It was not shown that this was the situation here, however, and though, at the time of trial three and a half years had elapsed since the merger, there was no indication either that any such changes had occurred or were reasonably likely to occur.

The record here is replete with statistics. Basic figures have been combined,

54. 96 Cong.Rec. 16,456 (1950) (Remarks of Senator O'Conor.)

55. Brown Shoe Co. v. United States, supra, p. 321, fn. 36, 82 S.Ct. p. 1521. See also A. G. Spalding & Bros., Inc. v. Federal Trade Commission, supra, 301 F.2d pp. 625–626; Crown Zellerbach Corporation v. Federal Trade Commission, supra, 296 F.2d p. 826.

56. Brown Shoe Co. v. United States, supra, 370 U.S. pp. 321–322, 82 S.Ct. 1521–1522.

separated, recombined and then combined again. Many of these combinations have no sound statistical basis and are predicated on implausible hypotheses not supported by evidence. Figures have been placed in unnatural and illogical groupings without regard to dissimilarity of products, separate and distinct industrial patterns or the realities of the marketplace. This was particularly evident in the proof concerning the last five lines of commerce where the Government unsuccessfully attempted to combine different products produced by different industries solely in terms of end uses.[57]

The 78 witnesses placed on the stand by the Government included, in addition to one can manufacturer, 18 representatives of glass container manufacturers, several plastic container manufacturers, three minor food packers, and a number of firms manufacturing toiletries, cosmetics and drugs.

Yet the Government failed to adduce testimony from these witnesses from which inferences or conclusions could be reasonably drawn that there was reasonable probability of anti-competitive effects or monopolistic tendencies. These witnesses, instead, gave a picture of keen and vigorous competition within the industries and markets with which they were respectively familiar and between such industries and markets and the other industries and markets involved, both before and after the acquisition. None of them gave evidence tending to show either that the merger had in fact lessened competition in any line of commerce or that there was any reasonable probability of its doing so.

Viewing the evidence as a whole, quite apart from theory, there was a total failure by the Government to establish the essential elements of a violation of Section 7. As will be apparent from a dis-

cussion of the proof relating to each specific line of commerce, the Government did not lay either the statistical or testimonial foundations required to establish its case. It was this failure of proof which required the dismissal of the complaint and entry of judgment for the defendants.

## VI.

### THE PROOF AS TO THE LINES OF COMMERCE SPECIFIED BY THE GOVERNMENT.[58]

#### (1) "The packaging industry."

The claim of the Government as to this line of commerce was dismissed during the oral argument of defendants' motion made at the close of the Government's case.

The evidence in the record on which the Government relied to establish what it called "the packaging industry" product market was confined to the mid-1956 letter from Continental answering Department of Justice inquiries concerning its proposed acquisition of Hazel-Atlas.[59] In that letter Continental outlined its diversification program and stated it was attempting to provide "tailor-made packaging" for a wide variety of products. In discussing this program the letter used the generic but undefined term "the packaging industry."

As requested, the letter estimated the percentage of the national market held by Continental in various groups of products for the year 1955. The products listed included metal cans, steel pails, lithographed kitchenware made of tin plate, unspecified military items, can closing equipment, metal closures, cork products, low pressure laminates, injection molding, rigid plastic containers, squeeze bottles, plastic pipe and fittings, paperboard, paper products (including paper cups and plates, nested containers and fibre drums) and flexible packaging.

---

57. These lines of commerce are containers for the soft drink industry, pp. 796–799, infra, the canning industry, pp. 799–802, infra, and the toiletries and cosmetic industry, the medicine and health industry, and the household and chemical industry, pp. 802–806, infra.

58. The lines of commerce will be discussed in the order in which they are listed at page 778, supra.

59. G–900. See supra, p. 784.

The estimates made by Continental of its share of the markets in these various products ranged from less than 2% in such product categories as paperboard and injection moldings, to 31.4% in metal cans, and in the single instance of fibre drums, to approximately 80%. With respect to several products no figures were available from which any informed estimates could be made and some of the products listed, such as plastic pipe, were no longer produced by Continental.

In addition to these product categories the Government apparently also sought to include within this line of commerce corrugated shipping cartons and other products manufactured by Gair, and glass containers, glassware, screw type metal closures and closures for home canning jars produced by Hazel-Atlas.

There was no definition of the boundaries of this alleged line of commerce in the record. Nor were there any universe figures for it. The Government offered in evidence a table purporting to compare the value of all packaging materials sold in 1957 and 1958 with the net sales and operating revenues of Continental for these years.[60] The table was excluded because there was no substantiation whatsoever of the overall figures which it contained. The comparisons which the table attempted to make between Continental's sales and revenues and the value of all packaging materials sold were shown to be utterly unsound statistically and entirely unsupportable. During the colloquy concerning the admission of this exhibit, it became apparent that the Government conceived of "the packaging industry" as involving a sales volume of more than ten billion dollars. The products which it sought to include fell into 43 general categories, each of which was subdividable into countless individual items. The products ranged from cooperage to grocery boxes, from transparent film to steel drums, from pill boxes to plastic and glass carboys, from fruit and vegetable baskets to plastic tubes and from Christmas wrappings to cigar boxes. Here we are veritably wandering in a sort of Clayton Act Wonderland where there is talk "of shoes— and ships—and sealing wax—of cabbages —and kings * * *." [61]

It is manifest that the broadest application of the product market test of "reasonable interchangeability of use or cross-elasticity of demand" could not possibly encompass this wide diversity of products and there was no evidence that it did. Nor was there any evidence concerning industry or public recognition of the market, peculiar characteristics and uses of the products involved, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, specialized vendors, or any of the other practical indicia by which a product market may be determined.[62]

Moreover, the record does not even show the names of the companies which were claimed to be a part of the industry, to say nothing of where they were located, what their annual sales were, or anything about them. There is nothing at all in this record from which it could be found that a relevant "packaging industry" product market exists.

Furthermore, there was no evidence at all about competition within this alleged market, let alone anti-competitive effects. In sum, there was complete failure of proof.

### (2) "The metal can industry."

The defendants conceded that this line of commerce, as delineated by the Government, was a separate and relevant product market, and I have so found. Thus, the Government's burden was confined to establishing that, in this product market, there was reasonable probability of substantial anti-competitive effects resulting from the acquisition.

60. G–803(5c) for id.

61. Lewis Carroll (Charles Lutwidge Dodgson), Through the Looking-Glass and What Alice Found There, Chap. IV, Stanza 11.

62. See discussion supra, p. 768.

The Government claims that in this line of commerce, as a result of the acquisition:

(a) Continental's increase in size and diversity, and its consequent ability to offer a full line of container products, gave it an advantage over smaller and less diversified can manufacturers which threatened to be decisive.

(b) Entry into the industry was made more difficult and more unlikely than prior to the merger, and the possibility of new entry was significantly decreased.

(c) It was probable that similar mergers would be triggered and that such further acquisitions would make effective competition less likely.

(d) Continental's incentive to push metal cans as against glass or plastic containers was reduced, and it was therefore less likely to be an industry innovator and pioneer.

(e) And finally, there was a tendency toward monopoly because the merger tended "to aggravate a general oligopolistic trend" in the industry.

We are dealing here with the effects of the merger in a specific line of commerce—the metal can industry. Unless the probability of substantial anti-competitive effects were shown in that industry, the Government case as to this line of commerce necessarily failed.

The Government's difficulty here was the same that it encountered so frequently in this trial. Its claims are pure speculation and, as far as I can discern, are not supported by any proof that it was reasonably probable that the claimed results would follow.

a. The Government urged that Continental obtained an advantage over its competitors in this industry which threatened to become decisive because of its ability after the merger to offer a "full line" of metal, glass and plastic containers, closures of various types and closure machinery. But there was no testimony that a can manufacturer obtained any particular competitive advantage by offering a full line of container products.

The only can manufacturer who testified was the Chairman of the Board of National Can, the No. 3 company in the industry, which manufactured general line and packers' cans only. His testimony was to the effect that National was expanding its operations; that it had built a new plant as late as 1956; that competition in the industry was "tougher"; but that National's earnings figures had gone down somewhat since 1956 though to what extent was not shown. He did not testify that there was any competitive advantage to be obtained in the can industry from offering a full line of products. Nor did he indicate that whatever decline in earnings National had had since 1956 was in any way ascribable to the Hazel-Atlas-Continental merger.

No other can manufacturer was called to testify. No one else testified on this subject. There were no documents or figures in the record supporting the Government's contention.

Plainly Continental, by its diversification program, expected to be able to compete more effectively against the strong competition in this highly competitive market.[63] But on this record it would be sheer speculation to conclude that because this was so, anti-competitive effects were likely to occur, to say nothing of competitive advantages which threatened to become decisive. There was no evidence of any such probabilities.

b. Much the same can be said of the Government's contention that the acquisition made new entry into the industry more difficult and significantly reduced the possibility of such entry. The only evidence which might be considered to bear any relation to this contention is the testimony of the National Can Board Chairman that there had been no new company among the six top producers since 1935, and that of the Board Chairman of Owens-Illinois Glass concerning

63. See discussion supra, p. 785.

the metal can business which that company carried on between 1936 and 1944.

The National Can Chairman did not testify that there was undue difficulty in entering the metal can industry at any time. This can scarcely be inferred from the fact that competition in the industry was keen and vigorous and becoming increasingly so. It is of course always difficult to enter a highly competitive industry. But the Clayton Act was surely not designed to make an industry less competitive so as to encourage new entrants. It was designed to insure that competition remained keen and vigorous.

As to the Owens-Illinois experience, it appeared that this company acquired various metal can companies in 1936, made a profit from its can business immediately before the war and disposed of the business in 1944 when, because of the war, it was difficult to get the necessary supply of tin plate. It then sold its can business to Continental for $7,500,-000. Continental did not acquire any other metal can company in the ensuing sixteen years up to the time of the trial.

There was no other evidence in the record bearing on this contention. There was no showing that the amount of capital required to enter the industry was unreasonably large, that any unobtainable know-how was required, that there were any patent barriers to entry, or that any other factors made entry difficult for anyone desiring to go into the business. Indeed, there was no evidence at all concerning problems of entry at the time of the merger or subsequently.

Once again the Government's claim was based on sheer speculation unsupported by proof.

c. There was no showing that this acquisition would trigger further acquisitions of glass companies by can companies. To sustain this contention the Government seized on a passing mention by the Executive Director of the Glass Container Manufacturers Institute that he had heard a rumor to the effect that a relationship had recently been established between American Can and Wheaton Glass Company. The subject was dropped there and never referred to in the evidence again. The Government made no effort to call either American Can or Wheaton to find out anything about this. There was nothing to show the nature of the arrangement, the reasons for it, what it was all about, or indeed that it in fact existed. Nor was there anything to show that if it did exist it had any connection with or bore any relation to the Continental-Hazel-Atlas merger.

d. The Government fared no better on its claim that as a result of the merger Continental was likely to lose the incentive to push can sales at the expense of glass. The Government introduced no evidence showing either that there had been or was likely to be any slackening of effort to push can sales. On the contrary, as has been pointed out, the object of the merger was diversification, and Continental was actively promoting intra-company competition between its various product lines.[64] Since by far the largest proportion of Continental's business was in metal cans, it scarcely seemed likely that cans would suffer at the expense of glass.

Moreover, subsequent to the merger Continental actively engaged in a vigorous research and promotion program in both its metal and glass container lines. In the light of the record and of the competitive realities, the notion that it was likely to cease being an innovator in either line is patently absurd.

e. Finally, the Government's claim that the acquisition would tend toward monopoly in the can industry rests on no firmer footing than the other claims just discussed. What the Government said it meant by this claim was that the merger would "tend to aggravate a general oligopolistic trend in an industry."

As far as I can discern, what the Government relied on in terms of specifics was that Continental had widely diversified its product lines by acquiring

64. Supra, p. 784.

other companies engaged in different businesses and now has assets and sales in excess of one billion dollars.

The Government placed in the record figures purporting to show the share of Continental in the combined metal can and glass container industries based on alleged total unit production. At best these figures rest on a somewhat shaky statistical foundation. But even accepting them at face value, Continental's share of the combined industries in 1957 was less than 25% and it remained in second place behind American Can which does not produce glass containers. The competition in both industries has consistently been keen and vigorous. There are many strong competing companies in both industries and there was no evidence of any diminution of competition. No reasonable probability that the merger will tend to create a monopoly was shown or could reasonably be inferred.

### (3) *"The glass container industry."*

This line of commerce, as delineated by the Government, was also conceded by defendants to be a separate and distinct product market and I have found that it was. Here, too, the Government's only obligation was to establish reasonable probability of substantial anti-competitive effects in a recognized product market.

Its claims were in large measure the same as those it made with respect to the metal can industry. It contended that the increased size and diversity of Continental after the merger, and its ability to offer a full line of container products gave it a competitive advantage in the glass container industry that threatened to become decisive; that entry into the industry had been made more difficult by the merger; that the acquisition would trigger self-defensive similar acquisitions; that there was less incentive for Continental to push glass at the expense of cans or plastics; and that there was a tendency toward monopoly in the industry.

All of these contentions failed for lack of evidence to support them. Little needs to be added here to what has been already said under the metal can line. Only additional features specifically bearing on the glass container industry will be discussed.

The evidence on which the Government relied to establish the likelihood of increased difficulty of entry into the industry as a result of the acquisition is illustrative of how flimsy its proof was on much of this case. The major emphasis was placed on a letter from Emhart Manufacturing Company, a producer of glass forming machinery, to the Antitrust Division in 1958.[65] The Government urged that a paragraph of the letter headed "Glass Container Business Requirements" stated the factors showing difficulty of entry into this field. A reading of the paragraph on which the Government relies is illuminating:

> "It is Emhart's opinion based on its experience that an essential requirement in entering the glass business is to obtain the services of at least one good man of executive or managerial caliber, experienced in the art of manufacturing glassware. A great deal of know-how is required, but the glass technology and engineering services of Emhart and others specializing in this industry are available. Machine operators are usually obtained from the unions. A large amount of capital is required. A real problem exists in finding a market for new production in competition with established manufacturers."

It is difficult to understand the claim that this paragraph supports the Government's position. The paragraph certainly does not show that entry into the glass container industry is any more difficult than would normally be expected in a well established highly competitive industry. The only indication as to what the statement "a large amount of capital is required" means is a proposal which Emhart made to Gallo Wine Company in

1956 with reference to the establishment, from the ground up, of a plant to meet Gallo's substantial wine bottle requirements. Emhart estimated the cost as slightly more than three million dollars, surely not an unreasonably large capital requirement for the institution of such an enterprise.

The Government's reliance on the failure of the Neville Island Glass Company in 1947, to show difficulty of entry in 1956, is just as far removed from reality.

This small company never got off the ground and lasted less than a year before it went into a Chapter X reorganization and was thereafter liquidated. As appears from the Section 167 report of its Trustee in Reorganization,[66] the company was doomed from its inception due to egregious under-capitalization, inadequate facilities, and incompetent management. Its failure, occurring nine years before the merger and thirteen years before the trial, proves precisely nothing.

As against this evidence, or lack of it, it appears that five new companies using Emhart machinery, and six other new companies, have in fact entered the glass container field since 1950, some independent and some captive. In addition, new production facilities have been placed in operation throughout the industry at a rapid rate, the growth and expansion of the industry have been rapid, and competition has consistently been keen and vigorous.

The Government also urged that Hazel-Atlas obtained competitive advantages in the glass container industry which threatened to become decisive because the Gair Division of Continental manufactured corrugated shipping cartons in which glass containers are usually shipped. This is the one instance in this case where the Government contended that there was an aspect to the merger of a vertical nature since the shipping carton represents a not insignificant part of the cost of the glass container as shipped. But here again the proof failed to support the theory.

Owens-Illinois and Anchor-Hocking, among other major glass container companies, produced corrugated shipping containers for their own use. Other companies used local suppliers in the vicinity of their plants, generally more than one local supplier. Yet others, such as Ball Bros., both manufactured such containers themselves and bought locally.

Corrugated shipping containers are readily available in any quantities required. There was nothing in the record to show that Hazel-Atlas, which before the merger was third in the industry and did not manufacture cartons, or any other company which did not do so, was under the slightest competitive disadvantage against manufacturers who made their own. Nor was there any evidence that any significant competitive advantage was to be gained by producing cartons, much less a decisive advantage.

The Government's next contention was that significant competitive advantages in the glass container industry were likely to accrue to Continental as a result of the acquisition because it produced crown caps which were used to close glass beer and beverage bottles, vacuum type closures used to seal hermetically glass jars, and vacuum closure machinery. Once more the evidence failed to support the Government's theory.

There was nothing at all about any competitive advantages to be derived by a manufacturer who produced both glass bottles and crown caps. As I shall point out a little later, Hazel-Atlas did not manufacture beer or beverage bottles or any other narrow neck bottles on which crown caps are used, to any significant extent, nor was there any likelihood of its doing so.[67] On the other hand, Anchor-Hocking and Owens-Illinois were large manufacturers of beer and beverage bottles. They did not manufacture crown caps. Their consistent positions in the industry make it manifest that they suffer no disadvantage from that fact. Plainly the crown cap contention has no merit.

66. Defendants' Exh. J.

67. See pp. 795, 799, infra.

As to vacuum closures and vacuum closure machinery—of the eighteen representatives of glass manufacturers who testified, seventeen did not refer to the subject of such advantages at all. The only glass manufacturer who mentioned it, the Vice-President of Brockway, indicated that there might be a sales advantage in selling both vacuum closures and glass containers. He said, however, that there was no reason why his company could not manufacture vacuum closures if it wished but that it had never chosen to do so. Significantly enough, according to his testimony, the sales of Brockway had risen from twenty-three million dollars in 1954 to fifty-one million dollars in 1959. It can scarcely be said that Brockway was significantly disadvantaged.

Owens-Illinois and Anchor-Hocking also make vacuum closures and machines for applying them. There was no evidence that any competitive advantages over other glass container manufacturers accrued to them because they did so.

The theory was also somewhat tentatively advanced by the Government that the Hazel-Atlas Division of Continental would have a significant competitive advantage in the glass industry by having access to the confidential customer lists of Continental. The Government offered no proof whatsoever to sustain this theory and it was without support in the record.

In addition the Government advanced the converse of the proposition which it urged with respect to the metal can line —that as a result of the merger Continental was likely to lose the incentive to push glass container sales at the expense of cans. In view of what has been said concerning the purpose of Continental's diversification program and the course it pursued after the merger, it is no more likely that Continental would slacken its efforts to promote glass than that it would slacken its efforts to promote cans. Indeed, if it had planned to do so there would have been little, if any, point to acquiring Hazel-Atlas, a major glass container producer.

Whether the Government's claims as to the effects of the acquisition in the glass container industry be considered separately or in combination, it showed no reasonable probability of substantial anti-competitive effects or tendency to monopoly in this industry as a result of the acquisition.

### (4) "Metal closures."

There are several types of closures used to close or seal containers, as I have already mentioned. They are made of a variety of materials, including tin plate, aluminum, plastic and paper.

The Government excluded from its "metal closure" line of commerce closures made of aluminum, plastic and paper and there were no statistics with respect to such closures in the record. It also excluded crown caps and home canning closures, both made of metal (tin plate). Thus the line of commerce which the Government defined as "metal closures" included only two types of metal closures—vacuum type closures and screw and lug type closures. The former were produced by Continental in its recently acquired White Cap Division but not by Hazel-Atlas, and the latter were made by Hazel-Atlas but not by Continental.

The proof offered by the Government failed to establish that vacuum type closures and screw and lug type closures can properly be combined into a single product market. In fact the evidence was to the contrary.

There was no public or industry recognition that such a product market existed. There was no showing of interchangeability of use, cross-elasticity of demand or cross-sensitivity of prices between the two distinct types of product which the Government sought to bracket together. There were no distinct classes of customers or any specialized vendors for both products. Production facilities for the two were quite different.

These products do not have the same characteristics or end uses. Vacuum closures whether of the side-seal, top-seal or roll-on variety, are used almost exclusively for heat sterilized food products

packed in glass containers where a vacuum is required to prevent spoilage. Screw type closures of metal and plastic, on the other hand, are used both for foods and non-foods. There was no showing that screw type closures were used on foods which require vacuum packing, and, as far as appears here, they are generally used to pack different food products from those which require vacuum closures and for non-food products as well.

Vacuum closures are applied by machine. A number of companies which produced vacuum closures, including Continental (White Cap), Owens-Illinois and Anchor-Hocking, also produced and sold or leased machinery for applying them. The closure machinery made by one company can be used to apply vacuum closures made by other companies, in some cases with and in some cases without minor modifications.

However, machines which apply vacuum closures cannot be used to apply screw type closures. They operate differently and much more speedily than screw type closure machines.

These two types of closures do not compete with one another to any significant degree, if at all. Each is in a quite distinct and separate line of commerce and I so find. Indeed, it appears that the Government has abandoned its contention that this combination of products constitutes a separate line of commerce by failing to request a finding to that effect.

In view of the failure to establish this as a line of commerce it is unnecessary to discuss anti-competitive effects of the acquisition within it, though, in any event, proof of such effects was wholly lacking.

(5) *"Containers for the beer industry."*

This is the first of the lines of commerce which the Government sought to define in terms of end use. It is composed of metal cans and glass bottles sold to brewers and used to package beer.

The proof indicates the following:

Beer can only be packaged in metal cans or glass bottles. The cans and bottles used to package beer are suitable only for that purpose.

Beer generates specific pressures which are peculiar to it. Beer cans and bottles are therefore structurally designed to resist such pressures and are not suitable for liquids such as carbonated beverages which generate different pressures. Beer cans and bottles are made in the same sizes in terms of capacity. Cans used for beer have special linings. Because of the characteristics of glass, beer bottles need not be lined. Thus, beer cans and beer bottles not only have the same end uses but have some common characteristics.

Brewers constitute a distinct and limited class of customer for both and they are sold to no other customers. Either one or the other may be used by the brewer as he chooses.

The trade associations of both the metal can and glass container industries have made extensive studies of the competition between beer cans and beer bottles and the inroads which they have respectively made on one another. Individual manufacturers, including Continental, have made similar studies. Each industry and the individual manufacturers in each were actively engaged in promoting the sale of one container as against the other.

Individual manufacturers of beer containers in each industry are sensitive to competition from the other. There was recognition in each industry of virtual interchangeability of use and cross-elasticity of demand between the two types of containers used for this purpose.

Manufacturers of beer cans and beer bottles showed considerable interest in the prices charged for the competing container and it is a fair inference that there was some price relationship between the two.

Of course, in view of the fact that defendants' motion to dismiss was granted at the close of the Government's case only one side of the picture was presented. At that stage of the case, however,

the proof adduced by the Government, standing as it did uncontradicted, established prima facie that this was a relevant product market.

The basis on which the defendants' motion to dismiss as to this line of commerce was granted was not therefore the Government's failure to establish the relevant product market but rather its failure to establish the reasonable probability of substantial lessening of competition or tendency to monopoly in the market as a result of the Hazel-Atlas acquisition.

The statistics on which the Government relied to show the scope and extent of this product market were based on unit sales of cans and bottles.[68] These figures are of questionable accuracy with respect to beer can units because of the method of computation used,[69] and with respect to beer bottle units because no weight was given to the fact that most beer bottles are returnable and are refilled an average of twenty-two times by the brewer.

Nevertheless, the figures in the record were an indication of the overall size of the market. According to these figures shipments of beer cans and bottles exceeded 8.8 billion units in 1955, 9.3 billion in 1956, and 9.6 billion in 1957. This was plainly a large product market.

Although at one time almost all packaged beer was sold in bottles, in a relatively short period the beer can made great headway and may well have become the dominant beer container. Beer cans represented approximately 83% of the total in 1955 and approximately 83.7% in 1957, though, as has been noted, the failure to give weight to the returnable bottle factor distorts these figures.

Continental's share of the beer can market, measured by units shipped, ran from 43% in 1955 to 46% in 1957. Its share of both beer can and beer bottle shipments, disregarding the returnable bottle factor, ran from 36% in 1955 to 38% in 1957. It is apparent that Continental had a sizeable share of the total product market.

The participation of Hazel-Atlas in the product market is in sharp contrast. Before the merger in 1955 Hazel-Atlas shipped only 9/10ths of one percent of the total beer bottles shipped, disregarding the returnable bottle factor. It shipped only 2/10ths of one percent of returnable beer bottles. In 1957, over a year after the merger, its total beer bottle shipments, again disregarding the returnable bottle factor, had barely advanced to 1.1% of the total beer bottles shipped.[70] There were no figures as to its shipments of returnable bottles in 1957.

These figures show only the extent of the Hazel-Atlas participation in beer bottles and not in the market composed of beer cans and beer bottles together. Its share in this overall market was only 14/100ths of one percent in 1955 and 17/100ths of one percent in 1957. The Hazel-Atlas share of the beer container product market was completely insignificant and indeed practically non-existent.

At the time of the merger for all practical purposes Hazel-Atlas was not a competitive factor in this product market, nor had it ever been. The acquisition of Hazel-Atlas by Continental could not have lessened existing competition in the market to any remotely significant degree and there is no evidence that it did. Nor was Continental's position in the market strengthened to any significant degree by the acquisition. It remained in second place behind American Can and its role in the market was not appreciably affected.

68. G–801(1d), (2d), (3d).

69. The unit figures are arrived at by converting base boxes of tin plate to short tons of steel and then applying a conversion figure to the tonnage to arrive at a unit figure. The conversion figure is based upon a hypothetical number of beer cans which might have been produced from each short ton of steel consumed. Although the formula used is related to methods used by the Bureau of Census, the reliability of the outcome was not demonstrated.

70. G–801(1d), G–800I.

The Government did not stress the claim that there was any actual lessening of existing competition in this line of commerce as a result of the merger. It contended, instead, that there might be anti-competitive effects in the future because the potential of Hazel-Atlas as a competitor in the manufacture of beer bottles had been eliminated. The difficulty with this position was that the evidence failed to show that, had the acquisition not taken place, there was any reasonable probability that Hazel-Atlas would become a significant competitive factor in the manufacture of beer bottles.

At the time of the acquisition Hazel-Atlas was primarily a manufacturer of wide mouth containers which could not be used for beer and had relatively few machines for the manufacture of narrow neck bottles. It did not make amber glass, required for most beer bottles, in any quantity. It was not able to produce beer bottles economically. Though it filled an occasional order it did not consider itself to be a manufacturer of beer bottles.

There was evidence that some of its wide mouth manufacturing machinery could have been converted to narrow neck manufacture at relatively little expense and that it would have been able to convert its flint glass tanks to the manufacture of amber glass had it desired to do so. But the record is devoid of evidence that it had any intention of so doing, or any reason for such a step which could have been taken only at the expense of its regular product lines.

Hazel-Atlas has no surplus capacity and its production was fully occupied with supplying its customers in the glass lines in which it had significant sales. Its plans to build a new plant in Plainfield, Illinois, had been deferred due to heavy increase in the costs involved. There was no intention, in any event, of using the proposed plant for the manufacture of beer bottles or of converting any of its existing facilities to such use. The Plainfield plant was planned for the purpose of producing the regular Hazel-Atlas product lines in the general Chicago area so as to bring it closer to that market and reduce freight costs.

Such scraps of evidence as there are concerning Hazel-Atlas's miniscule manufacture of beer bottles do not indicate that there was any likelihood of its becoming a significant competitor in the beer bottle field. There was a rumor that Hazel-Atlas was selling a few beer bottles on the West Coast in 1956 but there were also indications to the contrary. Two Hazel-Atlas salesmen in 1953, when it manufactured no beer bottles at all, referred to Owens-Illinois beer bottle prices in two unsolicited letters to the Company. A Hazel-Atlas officer, in a speech made in 1954, made brief reference to limited experiments in amber glass. That is all there was on this subject. It was plainly not enough.

Of course, there was always the *possibility* that Hazel-Atlas might, at some undetermined time in the future, for some undetermined reason, have undertaken to become a significant manufacturer of beer bottles. That, however, was mere speculation and by no means met the reasonable probability test.

There was no evidence in the record of any reasonable probability that the effect of the acquisition would be substantially to lessen competition or to tend toward monopoly in the beer container market.

### (6) *"Containers for the soft drink industry."*

The Government attempted to define this line of commerce, in terms of end use, as comprising metal cans and glass bottles used to package "soft drinks." However, it is difficult to understand just what the Government intended the term "soft drinks" to mean.

The statistics produced to support this line of commerce are confusing. The table as to shipments of glass containers included in this line of commerce was headed "Beverage containers, return-

able and non-returnable." [71] The table for metal can shipments included in the line was headed "Soft Drink Containers." [72]

"Beverages" apparently included bottled water, a variety of fruit juices and other unspecified drinks. One Government statistician, testifying on these tables, said that they included "mostly soft drinks" but that bottled water in carboys was also included. On the other hand, a food technician called by the Government testified that he considered soft drinks to be in the food category. Some fruit juice containers were classified as food containers, and orange drink in wide mouthed glass jars was classified under the heading "Dairy Products."

The Government's statistics were taken from Census Bureau figures, which in turn were derived from figures supplied by the Glass Container Manufacturers Institute. The Institute classified "beverages" as applying "to all bottles for soft drinks and water, carbonated or non-carbonated * * *." But this does not aid materially in resolving the confusion. [73]

There appeared to be no definition in the record of the term "soft drinks" as used in the metal can table but I will assume, for purposes of this discussion, that it includes at least carbonated and non-carbonated beverages. [74]

The figures for glass and metal containers were combined in a third table purporting to show total container shipments of "glass and metal soft drink and beverage containers." [75] This is the table on which the Government relied to establish this line of commerce.

Assuming the line includes both carbonated and non-carbonated beverages, and perhaps other products, there is no evidence to establish that this is a separate and distinct product market.

The boundaries of the market were undefined and there was no showing of interchangeability of use or cross-elasticity of demand between the various types of containers included. In fact, carbonated beverages generate even more pressure than beer, and bottles and cans used for those purposes must be specially designed to withstand such pressures. They have different physical characteristics from bottles and cans used for other soft drinks.

The practical indicia to be examined did not show that a product market consisting of carbonated and non-carbonated beverages and soft drinks exists and I have found that no such market was established.

However, after the case was concluded there were indications that the Government's position changed and that it then sought to have this line of commerce confined to carbonated beverages only. If this be so, the Government shifted its position with respect to this line at a very late date indeed. But assuming this

71. G–801(1e).

72. G–801(2e). These statistics are predicated on the same theoretical computations as were used for beer cans—that is to say, unit base boxes of steel converted into short tons of steel, converted in turn into can units.

73. For example, G–1205 gives the following instructions for reporting to the Institute production of containers for dairy products:
"This classification applies to all containers used by dairies. It includes milk and cream bottles, and it also includes cottage cheese jars, *orange and chocolate drinks when not in narrow neck beverage bottles.*" (Emphasis added.)

I assume that orange and chocolate drinks, when in narrow neck bottles are classified under beverages and, therefore, come under "soft drinks." But to confuse matters further, fruit juices, when in narrow neck bottles are included under containers for foods.

74. There is no evidence to indicate whether or not G–802, Table 2e, the Government's table on metal soft drink containers lumps metal containers for both carbonated and non-carbonated beverages together, but in order for these figures to be at all relevant on this line of commerce they must be consistent with those used for glass containers and with the term "soft drinks" as used by the Government.

75. G–801(3e).

change in position to be permissible, the Government is faced with the difficulty that no record was made to support its altered theory.

There were no universe or total unit figures and no breakdown figures in the record showing shipments of carbonated beverage containers, taken by themselves, as distinguished from soft drink and beverage containers generally. In the absence of such figures it is manifestly impossible to determine the extent of such a market or the shares of Continental, Hazel-Atlas and other manufacturers in it.

But quite apart from the failure of the Government to establish a carbonated beverage product market consisting of metal cans and glass bottles, it failed to show any anti-competitive effects of the merger in such a market, if it existed.

After considerable initial difficulty, metal can manufacturers developed a can strong enough to resist the pressures generated by carbonated beverages. These cans had advantages which distinguished them from glass bottles, including unbreakability, greater lightness in weight, lack of necessity for return, faster chilling and less storage space requirements. However, the cost as compared with the bottle, and particularly the returnable bottle, was and continued to be high. The metal can for carbonated beverages was conceived of as a luxury package to be sold at a premium price with a resulting increase in the overall sale of carbonated beverages rather than a decreased use of bottles by beverage manufacturers.

However, can manufacturers made strenuous efforts to promote the use of metal cans for carbonated beverages as against glass bottles. Despite these efforts, taking into account the estimate that returnable beverage bottles are re-used twenty-five times, not more than 1½% of all soft drinks sold were packaged in metal cans and the cans used for this purpose constituted less than 1% of overall can production.

Continental's share of this small market for metal soft drink containers ranged from 36% in 1955 to 26% in 1957.

Disregarding the important returnable bottle factor, the Hazel-Atlas percentage of total shipments of glass beverage containers was only 0.04% in 1955, 0.08% in 1956 and 0.6% in 1957.[76] It would, of course, be very much smaller were weight given to the returnable factor. In 1955 Hazel-Atlas shipped no returnable beverage bottles. The Hazel-Atlas share of total glass and metal soft drink and beverage containers shipped, once again disregarding the returnable bottle factor, was 0.03% in 1955, 0.07% in 1956 and 0.48% in 1957.

Thus, as in the case of beer containers, the Hazel-Atlas share of the product market consisting of metal and glass containers for soft drinks and beverages was so insignificant as to be for all practical purposes non-existent. Indeed, in 1955, prior to the acquisition it was only 3/100ths of one percent, even less than in the case of beer. Were any figures for carbonated drinks alone available in the record it cannot be assumed that Hazel-Atlas's percentage of this market would be any more significant.

Moreover, Continental's share in the total market was far from large, even with the returnable bottle factor disregarded. If that factor be disregarded, its share of the total shipments of glass and metal soft drink and beverage containers was 7.2% in 1955, less than 5.4% in 1956, and less than 6.2% in 1957.[77] Taking the returnable factor into account, however, as previously indicated, Continental's share of the market was so small as to be insignificant in terms of the overall market which the Government delineated.

---

76. The percentage figures for 1955–1956 shown as 0.1% for each year in G–801 are incorrect. I have used the correct figures.

77. Continental's shares of the overall market for 1956 and 1957 as shown on G–801(3e) include the bottles produced by Hazel-Atlas during those years.

Thus Hazel-Atlas was not a significant factor either in the theoretical beverage and soft drink container market or in the theoretical carbonated drink container market, nor had it ever been. In view of the limited acceptance of cans for these end uses Continental was scarcely more of a factor. Hazel-Atlas did not compete in these markets and the acquisition did not lessen competition in either of them to any remotely significant degree.

The Government also contends, as it did with respect to beer, that Hazel-Atlas was a potential competitor in the manufacture of beverage bottles and that anti-competitive effects may arise because such potential competition was eliminated by the merger. However, it was not established that there was any reasonable probability that Hazel-Atlas would have become a significant factor in the manufacture of soft drink bottles had the acquisition not taken place.

While Hazel-Atlas had produced a few satisfactory beverage bottles prior to the merger, its experience in this field was extremely limited and it had made only minor and very tentative efforts to sell such a product. Its facilities for decorating beverage bottles were inadequate, it had no franchises from any of the large bottlers such as Coca Cola which required their bottle manufacturers to be franchised, and the Hazel-Atlas management felt that small bottlers were not desirable customers since they were poor credit risks. With the exception of a brief passage in a speech by a Hazel-Atlas officer in 1954 which pointed out some of its difficulties in this area, there was nothing in the record indicating any likelihood that it would become a significant competitor in this field. The conclusion that it might have become so at some indeterminable time in the future is mere speculation.

The Government also urged that the acquisition reduced the incentive of Continental to press its metal can line for packaging soft drinks. There was not the slightest evidence to support this theory. Quite apart from the considerations regarding Continental's diversification program, already discussed, there was in fact no reduction in Continental's activities in promoting soft drink cans after the acquisition.

Thus I find that the Government failed to establish either a line of commerce consisting of "containers for the soft drink industry" or a line consisting of containers for carbonated beverages. Moreover, even had it done so there was no showing of any reasonable probability that the effect of the acquisition would be substantially to lessen competition or tend to monopoly in either of such product markets.

### (7) "Containers for the canning industry."

The line of commerce which the Government denominated "containers for the canning industry" included all metal cans and glass containers for the end uses of "canning" food. "Canning" was specifically defined by the Government as "the process of sterilizing foods, including juices, by heat and hermetically sealing them in tin cans and glass containers."

The Government's case as to this line of commerce was predicated on its definition of "canning." Yet the statistics concerning metal cans and glass containers which it placed in evidence to support this line [78] cannot be equated to its definition. These statistics related to glass and metal containers used for foods generally and were not limited to containers for foods which were heat sterilized and hermetically sealed. Though a number of foods are hermetically sealed when packed, many are not hermetically sealed and many others, though hermetically sealed, are not heat sterilized. Containers for all of these kinds of food were nevertheless included in the Government's figures.

The tables introduced did not show which of the containers included were used to pack either heat sterilized or

78. G–801(1c), (2c), (3c).

hermetically sealed foods, or both, and which were not. Some of the products included, moreover, such as coffee, were not even considered to be foods.[79]

Thus there were no universal figures in the record as to the amount of containers used for canning food as this term was defined by the Government, or any showing as to Continental's share of the metal cans, Hazel-Atlas's share of the glass containers, or their combined share of the containers of both types shipped for such end uses.

"Containers for the canning industry" was one of the lines of commerce specified by the Government before the pre-trial sessions began and its definition of this product market remained unchanged until after the case had been concluded. However, after defendants, upon argument of their motion to dismiss, had pointed out the deficiencies in the Government's proof as to this product market, the Government abandoned its claim that there was such a line of commerce. It then advanced for the first time the theory that the process of heat sterilization should not properly be included as a factor in defining this line and that only hermetic sealing was significant.

Thus, after all the evidence was in, the Government attempted to substitute an entirely different line of commerce for the one which it had theretofore consistently advanced. The new line was composed of glass containers and metal cans used to pack hermetically sealed foods and its boundaries were quite different from those of the line on which the case had been tried and on which the defense had been conducted.

However, the Government was in no better position to sustain this new line of commerce than it had been to sustain the old. It was apparent that the statistics in evidence combined both containers for foods which were hermetically sealed and those for foods which were not. For example, they included undetermined amounts of containers used to pack a large variety of products such as mayonnaise, mustard, honey, whole milk and baking powder, which were not hermetically sealed. Indeed the figures included metal cans and glass containers used to pack all types of food in the following categories: Fruits and vegetables (including juices); evaporated and condensed milk; other dairy products; meat (including poultry); fish and seafood; coffee; lard and shortening and all other food.

Thus the Government's statistics on its revised theory of this product market did not give any universe figures for shipments of glass or metal containers, or both, used to pack hermetically sealed foods. It figures were not and could not be broken down to show totals for foods hermetically sealed and those not hermetically sealed. Nor was there anything in the record from which to ascertain the amounts of cans in either category produced by Continental or by other manufacturers in the metal can industry, or the amounts of glass containers in either category produced by Hazel-Atlas or others in the glass container industry.

Thus, the Government's position in substance boiled down to this—that on the basis of statistics covering containers used for packing all types of food, whether hermetically sealed or not, and with no showing as to the proportions of containers used for hermetic sealing it sought to have the court find a line of commerce consisting of metal cans and glass containers used to pack hermetically sealed foods only.

It is manifestly impossible on the basis of such figures to determine the bound-

<hr/>

79. Excluded from the Government's definition of canned foods by one or both of the food experts who testified for the Government, were such items as coffee, mayonnaise, vegetable oil, shortening, syrup, concentrated fruit juices, pasteurized whole milk, pasteurized barbecue sauce, maraschino cherries, green and Spanish olives, peanut butter, nuts, condiments, frozen fruits and vegetables. Some items such as vinegar, pickles, fruit preserves and fruit jellies were excluded by one expert and included by the other.

aries of a product market consisting of metal and glass containers for hermetically sealed foods. Nor can it be ascertained, in terms of end uses, what products were packed in hermetically sealed containers and what products were not.

Moreover, there was no showing that there is any public or industry recognition of such a product market or submarket. Nor did any of the other indicia for determining whether there was such a relevant product market show that such a market or sub-market exists.

There remains only what appears to be some suggestion by the Government that there might be a product market consisting of metal cans and glass containers used to pack all of the types of food products included in the Government's statistics.

Such a line of commerce commends itself neither to logic nor to the realities of the market place. It not only includes a vast number of disparate products but it excludes a large number of similar products. If milk bottles are included, as they apparently are, why are paper milk cartons excluded? If screw top glass jars for hard candies are included, why are not cellophane bags for such candy also included? If jars and cans for spices are included in the market, why not cardboard containers, with or without metal ends, for spices?

Again, as in the case of the claimed product market for hermetically sealed foods, there was no public or industry recognition of any such product market as was suggested. The metal cans and glass containers included within it do not have the same physical characteristics and uses. Their shapes, sizes and other characteristics differ widely, depending upon the type of food to be packed in them. The characteristics of metal cans and glass containers used for packaging food do not differentiate them from cans and glass containers used for other purposes. Metal or glass food containers were not sold differently or shipped differently from non-food containers.

There was no showing of reasonable interchangeability of use or cross-elasticity of demand as between metal and glass containers used for packing food. At least sixty categories of foods are packed either in cans entirely, or almost entirely, or in glass entirely, or almost entirely.[80]

The Government went to some pains to have F. B. I. agents observe, on the shelves of chain stores in Atlanta, Chicago, Los Angeles and Washington, D. C., food products of different kinds, a number of which were available both in glass and metal containers, and a number only in glass or only in metal. But, except in limited instances, there was no information as to such factors as differences in price, size or quality of the products packed in the containers which were compared. There was no explanation as to why such differences in packing as there were occurred.

There are literally thousands of packers purchasing containers for packing hundreds of food products. The only three packers who were called to testify packed between them only 25 different food products. They represented but a tiny segment of the packing industry and of the products which the industry packed and there was no showing that they were representative. Only eight of the twenty-five products packed by these witnesses were packed in both glass and cans. The small quantity of string beans packed in glass did not sell. A few boiled onions were packed in glass because, for some obscure reason, "eye appeal" was important to certain people purchasing boiled onions. In the case of other of the eight products packed in both glass and cans, only glass was used for consumer sizes and only cans for the large institutional sizes.

The three packers called made it clear that different kinds of machinery and different cooking processes had to be

80. Defendants' Exh.N.

802

used for packing in glass and packing in cans.

It can scarcely be said that this testimony shows any general interchangeability of use or cross-elasticity of demand as between glass and cans. The fact that in some instances similar products were packaged in two or more different types of containers, or that at times one kind of container has supplanted another in the packing of the same product, does not show that different types of containers are generally commercially interchangeable.

Choice of type of container in which to pack a particular product may be dictated by a variety of factors, including traditional or changing preferences of the buying public, eye appeal, the nature of the trade to be served, the physical characteristics of the product to be packed, the type of packing process required, distance to outlets, and other diverse factors. But the record is barren as to the extent to which specific factors of this nature affect the choice of metal or glass containers in which to pack the enormous varieties and kinds of food products included within the broad range claimed for this product market.[31]

Metal cans and glass containers used for packaging food do not have unique production facilities. The manufacturing equipment and processes and the raw materials for each, far from being interchangeable, are entirely different. Moreover, as has been mentioned, the machinery used to pack food products in glass containers and the packing process are different from that used for packing in metal cans.

There was no evidence to show that the thousands of packers of food products who purchase metal cans or glass containers, or both, fall into any categories of distinct classes of customers. In fact, one of the glaring deficiencies in the

Government's proof on this line of commerce, and elsewhere in the case, was its failure to make any detailed inquiry into the customer pattern.

Nor was there any evidence of a distinct price structure for metal cans and glass containers used for food products, or of correlation or correspondence of prices between them. Indeed, the paucity of evidence on the subject of prices and pricing practices was another major deficiency in the Government's proof.

There are no specialized vendors of containers used for food products. Can manufacturers and glass manufacturers each sell their own products directly to users who in most instances have multiple sources of supply. There are apparently no jobbers or wholesalers who sell either cans or glass containers, or both.

Much of what has been said concerning a product market consisting of metal and glass containers used to pack all types of foods applies also to a market composed of such containers for hermetically sealed foods only. Such limited examination as was made in this case of the practical indicia for determining whether a product market exists did not establish that there was any line of commerce consisting of metal cans and glass containers used either for packing food products generally or for food products hermetically sealed.

It is therefore scarcely necessary to discuss the question of proof of anticompetitive effects in such product markets. It is sufficient to say that the Government failed to show any reasonable probability of substantial anti-competitive effects or of tendency to monopoly in these areas as a result of the Hazel-Atlas acquisition.

(8) "Containers for the toiletries and cosmetic industry;"

(9) "Containers for the medicine and health industry;" and

81. For example, ground coffee is packed 99% in cans and paper bags and less than 1% in glass. Soluble (or instant) coffee, on the other hand, is packed 99% in glass and 1% in cans. Catsup

is packed in glass for the consumer market and in cans for the institutional market. (Defendants' Exhibit N.) There is no explanation of these differences.

(10) *"Containers for the household and chemical industry."*

In each of these three lines of commerce respectively the Government sought to include, in terms of end use, glass, metal and plastic containers of every type used by the industry designated. Since such statistics and figures as were introduced to support these lines of commerce are inextricably confused and cut across all of them, and since the problems concerning them are in essence the same, they will be discussed together.

Each of the groups of manufacturers categorized as an "industry" produce a very wide range of products and use containers to package their products of many diverse kinds, shapes, sizes, materials and characteristics. For example, the numerous products packed by a representative group of companies in the toiletries and cosmetic industry include dentifrices, cosmetics, deodorants, face creams, bath salts, lipsticks, face powder, shampoos, colognes, hair dressings, medicated powders, analgesics, hand creams, nail polish, eye shadow, and hair spray. The containers used in packaging such products include glass containers, glass aerosols, metal aerosols, aluminum foil, paper, collapsible metal tubes, including lead and aluminum tubes, brass cases, plastic containers, both squeeze type and others, cloth, cans and paperboard boxes. Glass containers of various kinds are used more frequently than the others.

Manufacturers grouped in what is called the household and chemical industry manufacture an even wider range of products running into the hundreds, if not the thousands. To mention only a few, there are such disparate products as car wax; embalming fluid; insecticides; silver polish; inks; hydrochloric, nitric, sulphuric and other acids; chlorination liquids; rust removers; pet cleaners; weed killers; glue; blueing; and photographic chemicals. The containers used range from small cans to large glass carboys to fibre drums and include a wide range of materials.

What is called the medicine and health industry covers the whole range of medical and health products, including such items as prescription drugs, topical lotions, foot powders, rubbing alcohol, mercurochrome, throat and mouth sprays, eye drops and ear drops, cough syrups and cough drops, first aid kits, absorbent cotton and bandaids. Again the varieties and types of containers used to package the various products produced are extremely wide.

While it is apparent that the number of products produced by each of these industries is exceedingly large and varied, the scope of the respective industries was not shown by the evidence. There were no figures showing the extent of these industries and it cannot be determined which companies or which products are included in them and which are excluded. The statistics in the record do not show either unit or dollar figures for metal or plastic containers used in packaging products in these industries either separately or combined. It is impossible to determine what share Continental or Hazel-Atlas had of the container business in these fields either before or after the acquisition.

The statistical tables of Continental's metal can production include a category covering all non-food products and indicate that in 1955, 1956 and 1957 Continental shipped approximately 30% of the total shipments of such containers.[82] This figure includes cans for such products as pet food and motor oil which plainly do not come within the compass of any of the industries with which the three lines of commerce under discussion here are concerned. There was nothing to show what percentage of Continental's non-food metal can shipments fall into these categories nor what the shares of Continental are in the overall shipments of containers for use by these industries.

There were no figures at all showing what percentage of plastic containers for these industries were sold or shipped

82. G–801(2f).

by Continental, though there is an estimate that Continental sold between 7 and 9% of polyethylene bottles, tubes, jars and carboys and about 6% of the plastic squeeze bottles shipped in 1955.[83]

The three industry classifications used to delineate these lines of commerce were taken from the Bureau of Census categories for the glass industry. The Bureau of Census figures, expressed in totals only, and not broken down by individual companies, were in turn obtained from the Glass Container Manufacturers Institute which used these categories to collect statistics from its members.[84] The Census Bureau used quite different categories in collecting figures for the metal can industry and had no figures at all for the plastics industry.

There were figures indicating that in 1955 Hazel-Atlas shipped about 10% of the narrow neck bottles and about 40% of wide mouth glass containers for the household and chemical industry. It also shipped about 9% of narrow neck glass containers and 28% of wide mouth glass containers for the toiletries and cosmetic industry, and about 6% of narrow neck and 25% of wide mouth glass containers for the medicine and health industry.[85]

But there were no totals for plastic and metal container shipments to these three industries. Nor were there any totals for the combined shipments of glass, plastic and metal containers to them with which to compare the Hazel-Atlas figures, or any showing of what the Hazel-Atlas share of such totals might be.

Apart from its failure to produce evidence showing the size and scope of the product market said to be embraced within these three lines of commerce, the Government also failed to show any other factors establishing that such lines of commerce existed.

There was no public or industry recognition of any such product markets either separately or in combination.

There was no showing that the containers which were sought to be included had peculiar characteristics and uses. The wide variety of sizes, shapes and kinds of containers and of different products packed in them has already been referred to. Plastic containers could not be used at all to package a goodly number of products because plastic is too porous. There are other differences between the products sought to be included such as the use of opal glass jars to package certain types of products and flint glass jars and bottles for others; the peculiar characteristics of the plastic squeeze bottle and of the aerosol type of container; the differences in design, decorative features and fitments of various types of containers; and the differences in weight between glass, metal and plastics. Moreover, there are many other materials used to package products included within these industry categories which are excluded entirely from consideration here without explanation.

It was not shown that the general characteristics and uses of the various types of containers used for packing products in any one of these industries were the same or that their characteristics and uses necessarily differentiated them from containers used in other industries, or, indeed, for other purposes entirely. Containers used by these industries were not sold or shipped differently from any other containers.

It did not appear that there was any reasonable interchangeability of use or cross-elasticity of demand between containers made of these different materials. It is true that glass container, plastic container and metal container manufacturers are each seeking to promote their lines of containers at the expense of other lines, and that all are attempting to improve their products or to develop new ones so as to have a wider customer appeal. But, as has been pointed out, this, in itself, does not establish reasonable interchangeability.[86]

83. G–810.

84. See fn. 28, supra, p. 772.

85. G–800.

86. See supra, p. 781.

Here, as in the case of foods, the choice of container may be dictated by a wide variety of factors, as the testimony of the witnesses from companies engaged in the manufacture of toiletries and cosmetics showed. In this field plainly the matter of customer appeal is of paramount importance. The physical characteristics of the product to be packed and the nature of the trade to be served also have a major effect on the choice of the container for a particular product.

It is true that manufacturers from time to time may shift a product from one type of container to another. But there does not appear to have been any general shifting back and forth as between the containers used for a given product. Packaging changes are made only after careful research and investigation and are normally permanent in character. For example, switches for a particular end use from glass to plastic and back from plastic to glass do not appear to occur.

The Government lays some emphasis on the packaging of light duty detergents. Such detergents in powder form were originally packed in paper containers. When light duty liquid detergents were developed they were first packaged in glass containers since no other container was functionally suitable. After a modification in the product formula, light duty liquid detergents changed from glass to metal containers. Most of them now are packed in plastic containers and apparently the product has never returned to the container from which it was shifted.

Again, as in the case of foods, the Government introduced evidence as to observations of F. B. I. agents of products on the shelves in chain stores and department stores. These observations indicated that some products were sold in containers made of glass, plastic and metal, some of glass and metal, and some of metal and plastic. Other products, on the other hand, were sold only in one type of container.

But, as in the case of foods, with limited exceptions, no observations were taken as to differences in sizes, prices, or quality of products, the uses for which they were intended, or any other factors which might determine the choice of the container for them. There was no showing that the products packed in containers made of the same material represented any substantial proportion of the total number of products included within these industries. On the contrary, it appears that in the larger stores, at least, there were thousands of products on the shelves which might be classified as sold by these industries and the products found in containers made of the same materials represented only a small proportion of the total.

As to the medicinal and health and household and chemical industries, there was no evidence that there were any distinct classes of customers engaged in purchasing all three types of containers, though some overlap could certainly be expected in view of the great number of different products being packed by these industries.

As to the toiletries and cosmetic industry, certainly the principal toiletry and cosmetic manufacturers normally purchased all three types of containers. This again was to be expected in view of the large number of different kinds of products which they packaged and is of no particular significance in the line of commerce context.

There was no distinct price structure for the three kinds of containers included within these lines of commerce. It appears that plastic containers have been and remain considerably more expensive than glass containers. While a number of toiletry and cosmetic manufacturers take some account of differences in prices between the various kinds of containers, as they would be expected to do, it does not appear that this is a dominant or controlling factor in selling a container for a particular product. While manufactures of one type of container pay some attention to the prices of other

types, it was not shown that there was any correlation or correspondence of prices between the three types of containers.

There is no evidence that there are any specialized vendors for containers of these types. Manufacturers sell their own products directly to users who appear to have multiple sources of supply.

Here again the Government failed to establish the lines of commerce which it specified either separately or in combination. There is no showing that there are any product markets consisting of metal, plastic and glass containers for use by the toiletry and cosmetics, medicine and health, or household and chemical industries. Inter-industry competition between plastic, metal and glass manufacturers in the sale of containers to package some products included within these industries there no doubt is, but separate relevant product markets in the antitrust sense were not shown to exist.

Again, since no lines of commerce have been established there is no necessity for discussing the Government's claims as to anti-competitive effects of the acquisition in such lines. It should be said, however, that none of the numerous witnesses representing toiletry and cosmetics manufacturers or the representative of the largest plastics container manufacturer who testified with respect to these lines of commerce, indicated that the Hazel-Atlas acquisition had had or was likely to have any effect of any kind on their own businesses or generally. All gave a picture of healthy competitive conditions both before and after the acquisition with no suggestion of any anti-competitive effects or tendency to monopoly.

## VII.

### CONCLUSION.

The evidence in the record at the close of the Government's case has been weighed not only as a whole, but as to each of the ten lines of commerce on which the Government relied until the end of the trial, as to such possible alternative lines as the Government suggested after its case had been concluded, and as to any other product markets which may have existed. Such inferences have been drawn from the evidence on each aspect of the case as were reasonably justified.

After doing so, I concluded that the proof submitted by the Government established only three of the ten lines of commerce or relevant product markets which it attempted to delineate in this case—the metal can industry, the glass container industry and containers for the beer industry. As to these product markets I found that there was no proof of any reasonable probability of substantial anti-competitive effects or tendency to monopoly in any of them as a result of the acquisition of Hazel-Atlas by Continental.

I also concluded that the proof failed to establish that any of the other lines of commerce which the Government delineated or suggested were in fact relevant product markets or sub-markets. In addition, I concluded that there was no evidence in the record establishing any relevant product markets or sub-markets other than those relied upon or suggested by the Government.[87]

Moreover, even assuming that any such product markets existed, I have found there was no proof of any reasonable

87. I found that vacuum type closures and screw and lug type closures while not forming a product market in combination, each constituted a separate product market. These products did not compete with one another to any significant degree. Their respective product markets were not areas of effective competition in the context of this case and were not "relevant" in that sense. (See p. 793, supra.)

The plastic container industry was a recognized separate industry (see p. 776, supra) and may constitute a separate product market. However, the Government made no attempt to establish such a relevant product market here.

probability of substantial anti-competitive effects or tendency to monopoly as a result of the acquisition in any of them.

Thus, the Government wholly failed to sustain its burden of proof in this case.

Some measure of its failure of proof here can be gathered from a comparison with the proof adduced in the Brown Shoe case. I do not mean by this to suggest that the proof in Brown Shoe sets any minimal standards for determining Section 7 violation. However, such a comparison is illustrative of the deficiencies in the Government's proof in the case at bar.

The Brown Shoe case involved a merger, both horizontal and vertical, of two companies in a single, well-recognized, separate industry. In the case at bar, on the other hand, the merging companies were each in different industries and the merger was almost entirely of a conglomerate nature. I have already pointed out the different problems presented by conglomerate mergers and horizontal or vertical mergers, the difficulties of proof in a conglomerate case and the necessity in such a case for detailed examination of all of the factors which might bear on relevant product markets and anti-competitive effects within them.[88]

In the light of the differences between the two types of cases, it is particularly significant that the proof in Brown Shoe which impelled the Court to strike down the acquisition there, went far beyond the proof adduced in the case at bar.

For example, in Brown Shoe there was "[t]estimony in the record from numerous independent retailers, based on their actual experience in the market, demonstrat[ing] that a strong, national chain of stores can insulate selected outlets from the vagaries of competition in particular locations and that the large chains can set and alter styles in footwear to an extent that renders the independents unable to maintain competitive inventories."[89] There was also evidence "that

[the merger] creates a large national chain which is integrated with a manufacturing operation. The retail outlets of integrated companies, by eliminating wholesalers and by increasing the volume of purchasers from the manufacturing division of the enterprise, can market their own brand at prices below those of competing independent retailers."[90]

Moreover, the proof in Brown Shoe established lines of commerce within a single industry, well recognizable in terms of the commercial realities. There was detailed testimony as to specific and demonstrable anti-competitive effects in each of these lines of commerce in specifically defined economically significant geographic markets.

It was on evidence of this nature, taken in conjunction with proof of the market shares held by the combining companies and the trend toward concentration in the industry, including Brown Shoe's own part in that trend, that the Court found that the Brown Shoe-Kinney merger violated Section 7.

Here, in contrast, seven of the ten lines of commerce which the Government attempted to carve out were artificially contrived and were neither recognized as separate product markets nor comported with market realities. Beyond this, as to no product market in the case at bar was there evidence from competitors in the relevant industries, from buyers of the products involved, or from any other sources, that there was reasonable probability of any anti-competitive effects, substantial or otherwise, or any tendency to monopoly as a result of this acquisition.

Lacking evidence to sustain its burden, the Government speculated as to what might happen as a result of the acquisition. In the light of the record these speculations were at best mere possibilities. There was no proof of reasonable probability that such anti-competitive effects as the Government foresaw were

88. Supra, p. 783.

89. Brown Shoe Co. v. United States, supra, 370 U.S. at p. 344, 82 S.Ct. at p. 1534.

90. Ibid.

likely to occur or that, if any of them did occur, they would be substantial.

It has been said that " * * * mergers are a common form of growth; they may lessen, increase, or have no effect upon competition. A merger as such involves no necessary connotations of coercion, dominance or lack of effective competitive pressures." [91]

As far as the record here shows the merger under scrutiny in this case had no such connotations and, in fact, had no significant effect upon competition in any product market. This merger was not shown to be one of those proscribed by Section 7 of the Clayton Act.

Thus, at the end of the Government's case it was apparent that the Government had not succeeded in establishing any violation of Section 7. Defendants were therefore entitled to judgment which will be entered accordingly.

This opinion constitutes my findings of fact and conclusions of law in this case pursuant to Rule 52(a), F.R.Civ.P.

It is so ordered.

91. Report of the Attorney General's National Committee to Study the Anti-Trust Laws, March 31, 1955, p. 124.